Ford & Harrison LLP
Daniel B. Chammas (SBN 204825)
Jenny S. Choi (SBN 285839) (*Admission Pending*)
350 South Grand Avenue
Suite 2300
Los Angeles, CA  90071
Telephone:    213-237-2400
Facsimile:    213-237-2401

Attorneys for Defendants
TODD BALDINI, ABYGAIL BIRD, LAWRENCE
STUART GIRARD and PAMELLA TEJADA

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EXAMWORKS, LLC, a Delaware limited liability company, | Case No.  2:20-cv-00920-KJM-DM |
| Plaintiff, | **OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION** |
| v. | Action Filed:  May 4, 2020 |
| TODD BALDINI, an individual, ABYGAIL BIRD, an individual, LAWRENCE STUART GIRARD, an individual, PAMELLA TEJADA, an individual, ROE CORPORATION, and DOES 1 through 10,, | Date:        March 22, 2020<br>Time:        10:00 a.m. |
| Defendants. | |

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

1

2:20-CV-00920-KJM-DM
OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................. 1

II.     STATEMENT OF FACTS ..................................................................... 3

III.    PROCEDURAL HISTORY .................................................................... 4

IV.     THE CONDUCTING BUSINESS PROVISION IS VAGUE, STANDARDLESS, AND SHOULD BE REJECTED FOR THAT REASON ALONE ................................................................................. 6

V.      THE CONDUCTING BUSINESS PROVISION IS BREATHTAKINGLY BROAD ............................................................................................... 7

    A.    The Proposed Injunction Cannot Prohibit The Individual Defendants From Doing Any Business With Trade Secret Customers Unless They Have Also Solicited Those Customers In Competition With ExamWorks ..................................................................................... 8

    B.    The Individual Defendants Cannot Be Prohibited From Reaching Out To ExamWorks' Trade Secret Customers To Announce Their New Affiliations ................................................................................. 11

    C.    An Injunction Should Not Prohibit Even The Solicitation Of All Individuals Or Entities On ExamWorks' Customer List ................. 13

        1.    The Only Evidence That ExamWorks' Customer Lists Are Trade Secrets Is The Value Of Information Contained On Customer Lists, And Not The Identities Of The Customers Themselves .................................................................. 13

        2.    The Individual Defendants Should Be Able To Solicit any Covered Individual or Entity That They Knew About Prior To Working At ExamWorks .......................................... 15

        3.    An Individual Defendant Should Be Able To Solicit Any Covered Individuals And Entities With Whom His Or Her Current Employer Has An Independent Relationship .......... 16

        4.    The Individual Defendants Should Be Able To Solicit Any Covered Individual Or Entity For Work For Their New Employer That Does Not Compete With ExamWorks ........... 17

VI.     THE COST OF THE FORENSIC NEUTRAL SHOULD BE PAID FOR BY EXAMWORKS BECAUSE IT IS THE PARTY PROPOUNDING THE DISCOVERY AND BECAUSE ITS RESOURCES DWARF THOSE OF THE INDIVIDUAL DEFENDANTS .................................................... 18

VII.    ABYGAIL BIRD PROVIDED ADMINISTRATIVE SUPPORT TO GIRARD AND IS ALLEGED TO HAVE DONE NOTHING MORE THAN SEND A SINGLE EMAIL TO GIRARD ............................................ 19

Ford & Harrison
LLP
Attorneys At Law
Los Angeles

2:20-CV-00920-KJM-DM
OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION

1

VIII.    PAMELLA TEJADA DID NOT ENGAGE IN ANY WRONGDOING
         AND MERELY LEFT EXAMWORKS TO WORK FOR A COMPANY
2        THAT DOES NOT COMPETE WITH EXAMWORKS ................................................. 19

3    IX.    CONCLUSION ........................................................................................................... 20

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ii

2:20-CV-00920-KJM-DM
**OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION**

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Farmers Ins. Exch. v. Steele Ins. Agency, Inc.*,
   2013 U.S. Dist. LEXIS 162575 (E.D. Cal. Nov. 13, 2013) ..................................... 12

*Gable-Leigh, Inc. v. North Am. Miss*,
   2001 U.S. Dist. LEXIS 25614 (C.D. Cal. Apr. 9, 2001) ........................................ 8

*Granny Goose Foods v. Bhd. of Teamsters & Auto Truck Drivers*,
   415 U.S. 423 (1974) ............................................................................................. 6

*Hair Club for Men, LLC v. Elite Solutions Hair Alternatives, Inc.*,
   2007 U.S. Dist. LEXIS 30167 (E.D. Cal. Apr. 5, 2007) ....................................... 12

*In Strikepoint Trading, LLC v. Sabolyk*
   Strikepoint Trading, LLC v. Sabolyk, 2009 U.S. Dist. LEXIS 140486 (C.D. Cal. Aug. 18,
   2009) ..................................................................................................................... 10

*Interloc Solutions, Inc. v. Tech. Assocs. Int'l Corp.*,
   2007 U.S. Dist. LEXIS 66778 (E.D. Cal. Aug. 23, 2007) ..................................... 12

*MAI Systems Corp. v. Peak Computer, Inc.*,
   991 F.2d 511 (9th Cir. 1993) ............................................................................... 11

*Pyro Spectaculars North, Inc. v. Souza*,
   861 F. Supp. 2d 1079 (E.D. Cal. 2012) ............................................................... 10

*Saucedo v. Brazelton*,
   2015 U.S. Dist. LEXIS 96361 (N.D. Cal. Jul. 21, 2015) ..................................... 18

*Union Pac. R.R. v. Mower*,
   219 F.3d 1069 (9th Cir. 2000) ............................................................................. 6

**State Cases**

*Aerotek, Inc. v. Johnson Grp. Staffing Co.*,
   2013 Cal. App. Unpub. LEXIS 5424 (Cal. Ct. App. Jul. 30, 2013) ...................... 12

*American Credit Indemnity Co. v. Sacks*,
   213 Cal. App. 3d 622 (1995) ............................................................................... 12

*Hilb, Rocral & Hamilton Ins. Servs. v. Robb*,
   33 Cal. App. 4th 1812 ......................................................................................... 12

*Morlife, Inc. v. Perry*,
   56 Cal. App. 4th 1514 (1997) .............................................................................. 9

**Rules**

Rule 65 .................................................................................................................. 6

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

iii

2:20-CV-00920-KJM-DM
**OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION**

1   I.      **INTRODUCTION**

2           Todd Baldini and Stuart Girard do not dispute that they took ExamWorks information while

3   they were still employed at ExamWorks.  Their devices and accounts have now been turned over

4   to a forensic neutral and they will never have access to that material again.  Baldini and Girard do

5   not oppose an injunction to require the completion of the forensic inspections of their devices and

6   accounts, or to prevent them from using or disclosing any ExamWorks confidential information.

7   The proposed injunction, however, goes much farther than the law permits.  Specifically, the

8   provision barring Baldini, Girard, Tejada, and Bird (the "Individual Defendants") from "conducting

9   business" with any individual or entity ("Covered Individuals or Entities") who did business with

10  ExamWorks before they left and that are identified on the materials taken by them is unlawful in

11  California ("Conducting Business Provision").

12          In California, an individual is permitted to do business with his or her former employer's

13  customers, even if they are trade secret customers.  The only restriction on a former employee when

14  dealing with a trade secret customer is that he or she cannot **solicit** those customers.  A former

15  employee, in fact, can even go so far as to send to trade secret customers an **announcement**,

16  informing these customers of their departure and new business affiliation.  An injunction, therefore,

17  can (1) stop defendants from using trade secret material, (2) stop defendants from soliciting trade

18  secret clients, and (3) stop defendants from doing business only with those customers they have

19  already solicited.  The Conducting Business Provision is impermissibly broad, as it purports to

20  prevent the Individual Defendants from doing business with more than 100,000 potential

21  customers, without any showing that they were ever solicited by the Individual Defendants.

22          Furthermore, ExamWorks has not even made a showing that it should be able to prevent

23  the Individual Defendants from soliciting any of the Covered Individuals or Entities.  First, the

24  names and contact information of potential physician clients are widely available.  The State of

25  California, in fact, posts a Qualified Medical Evaluator database that allows anyone to search for

26  such doctors by specialty and location and to obtain their contact information.  Marketing to

27  attorneys specifically representing applicants in the workers' compensation world is also a matter

28  of public record, as the California Applicants' Attorneys Association provides a database of

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

1

2:20-CV-00920-KJM-DM
OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION

applicant attorneys, searchable by location and specialty. Even ExamWorks acknowledges that it is not the contact information of these lawyers and doctors that is valuable, but that the information it has compiled over the years about these clients would allow a competitor to threaten its business. There simply is no reason why the Individual Defendants should not be permitted to solicit physicians and attorneys that they locate on these public databases without using any ExamWorks information.

Second, any injunction enjoining the solicitation of Covered Individuals or Entities must have a carve-out for those that the Individual Defendants knew about independently of ExamWorks. Baldini and Girard had decades of experience working with insurance companies, physicians, attorneys in the workers' compensation field prior to working for ExamWorks. Baldini and Girard can fairly contact these potential customers that they already knew about and solicit them for business, as doing so would not misappropriate or even implicate ExamWorks' trade secrets.

Third, any injunction enjoining the solicitation of Covered Individuals or Entities must have a carve-out for individuals and entities with whom the Individual Defendants' current employer has a pre-existing relationship. Baldini and Girard work at Integrated Pain Management Medical Group, Inc. ("IPM"), which engages doctors to treat patients. Baldini and Girard should not be prohibited from soliciting the business of doctors that IPM has worked with in the past. The same is true for Tejada, who works for Dunamis Alliances, LLC ("Dunamis").

Fourth, if an injunction enjoins the solicitation of Covered Individuals or Entities, the prohibited solicitation should be limited to work that is competitive with ExamWorks. ExamWorks primarily does forensic evaluative medical services in connection with any litigation or workers' compensation or disability claims. The vast majority of IPM's business, by contrast, is providing a primary treating physician, not a qualified medical evaluator, to treat patients. Similarly, Tejada works for Dunamis, a records acquisition company, and it asks its staff, including Tejada, to solicit law firms using public databases for its business with respect to its records. None of these services competes with ExamWorks, and the Individual Defendants should be able to solicit any customers for business that is not competitive with ExamWorks.

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

2

2:20-CV-00920-KJM-DM
OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION

1    The Individual Defendants also would like to ensure that ExamWorks pays for the discovery

2    it is asking the forensic neutral to perform.  The language of the proposed injunction currently

3    provides that the Individual Defendants will, "at their own expense," "make any electronic device

4    or account that contains relevant electronic evidence available within 48 hours of this order to a

5    neutral and mutually agreed-upon third-party forensic expert."  It is not clear about who pays for

6    the imaging and the searching thereafter.  While the proposed injunction does say that the Individual

7    Defendants "at their own expense, [must] work with the Forensic Expert to permanently and

8    forensically remove" all ExamWorks confidential information, ExamWorks, as the party

9    demanding this discovery, should bear these costs.  Furthermore, the Individual Defendants are

10   being financially crushed by this litigation, and cannot finance use of an expert by ExamWorks (a

11   multi-billion dollar company) to collect, image, cleanse, and search these devices and accounts.  At

12   a minimum, the Individual Defendants should pay for no more than the collection and imaging of

13   the devices, as well as the removal of ExamWorks confidential information, but all further costs of

14   the expert, such as searching, should be paid for by ExamWorks.

15   Finally, there is a complete lack of evidence to issue an injunction against two of the

16   Individual Defendants—Bird and Tejada.  Neither of them sent or took any confidential information

17   of ExamWorks and neither of them was involved in the planning to compete while they were

18   employed.  The only evidence against Bird is that she emailed her boss two spreadsheets three

19   months before he resigned.  Tejada also did not take any trade secret information, was not involved

20   in any plans to do so, and never used any such information.  No injunction should issue against

21   Bird or Tejada.

22   **II.    STATEMENT OF FACTS**

23   Starting around October 2018, Baldini and Girard, while working for ExamWorks,

24   discussed amongst themselves an idea to leave ExamWorks and compete in the medical-legal

25   space.  (Girard Decl., ¶ 2; Baldini Decl., ¶ 2.)  It was not until 2020, however, that Baldini and

26   Girard ultimately decided to leave ExamWorks.  (*Id.*)  In preparation for their new employment,

27   Baldini and Girard regrettably took ExamWorks' information before leaving.  (*Id.*)  Baldini and

28   Girard, however, never used any of the information they took to compete with ExamWorks.  (*Id.*)

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

3

2:20-CV-00920-KJM-DM
**OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION**

Tejada did not have any involvement in the plans of Baldini and Girard to leave ExamWorks until she was approached by them in late January 2020. (Tejada Decl., ¶¶ 2-3.)  Tejada eventually also left ExamWorks and started working for a medical records company called Dunamis.  (*Id.*)  Tejada never sent herself or otherwise acquired any ExamWorks documents or information for use after she left.  (*Id.*, ¶¶ 5, 7.)

Bird never had any involvement in any of this.  She never left with or to work with any of the other defendants, and there is no evidence that she took any ExamWorks' information. (Girard Decl., ¶ 3; Bird ¶ 4.)  The only evidence that ExamWorks has to tie Bird to any of this is that she sent an email to Girard with allegedly sensitive ExamWorks information **months** before he resigned.  Girard, however, was Bird's boss, and it was part of her job to send documents he requested.  (Girard Decl., ¶ 3; Bird ¶¶ 2-3.)

## III.   PROCEDURAL HISTORY

On Monday, May 4, 2020, ExamWorks filed this action against Girard, Baldini, Tejada, and Bird primarily for misappropriation of trade secrets and breach of duty of loyalty.  (Dock. No. 1.)  The following day, ExamWorks filed an application for a temporary restraining order, which, among other things, sought to "[e]njoin Defendants from conducting business with any individual or entity that did business with ExamWorks before Defendants stopped working there to the extent those individuals or entities are identified in the trade secret materials misappropriated by Defendants."  (Dock. No. 4.)  On Friday, May 8, 2020, three of the four Individual Defendants did not attend the hearing, and Bird, who did, was not represented by counsel.  (Dock. No. 17.)  Without any opposition present, the Court granted the application for a temporary restraining order, but set it to expire in two weeks, on May 22, 2020.  (*Id.*)

After being engaged on the case, Defendants' counsel immediately began cooperating with Plaintiff's counsel.  (Chammas Decl., ¶ 2.)  On Friday, May 8, 2020, having just been retained, Defendants' counsel spoke on the phone with Plaintiff's counsel about the status of the case.  (*Id.*)  Later that day, Defendants' counsel wrote to Plaintiff's counsel, stating that "we would like to begin negotiating a stipulated preliminary injunction.  Instead of briefing the issue over the next two weeks, I believe we can agree to most of it with a few caveats we discussed today."  (*Id.*)  The two

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

4

2:20-CV-00920-KJM-DM
**OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION**

"caveats" discussed by Defendants' counsel on the phone were better defining "conducting business" and having ExamWorks pay for the forensic neutral.  (*Id.*)

On Sunday, May 10, 2020, Defendants' counsel sent a proposed stipulated preliminary injunction, with the primary revisions to the Conducting Business Provision and the cost of the forensic neutral. (*Id.*, ¶ 3.)  The next day, Plaintiff's counsel responded to this proposal, dismissing all of the proposed revisions and simply stating that "[w]e are willing to stipulate that the current TRO remains in effect and that the PI hearing and associated expedited discovery dates can be continued for a short period of time so that there is more time built in for the schedule."  (*Id.*)

About 10 minutes later, Plaintiffs' counsel, for the first time, "suggested" a single forensic neutral (with an hourly rate of $550 per hour) for the Individual Defendants to consider.  (*Id.*, ¶ 4.)  Defendants' counsel later that afternoon politely passed on this suggestion, and promised to provide alternate candidates.  (*Id.*)  Later that night, Defendants' counsel again sent Plaintiff's counsel a proposal on a stipulated preliminary injunction, with further revisions.  (*Id.*)

The next morning, on Tuesday, May 12, 2020, Defendants' counsel proposed two candidates for the neutral forensic expert, advising Plaintiff's counsel that they could choose either one.  (*Id.*, ¶ 5.)  Later that morning, Plaintiff's counsel agreed to one of the choices, Setec Investigations ("Setec"), and the parties immediately began drafting a forensic inspection protocol. (*Id.*)  Into the night of May 12, 2020, the parties negotiated various protocols for the collection, imaging, return and searching of the Individual Defendants' devices.  (*Id.*)

At 6:24 p.m. that evening, Defendants' counsel wrote Plaintiff's counsel that "[w]e are standing by ready to provide all relevant devices and accounts to Setec" upon resolution of a final material term regarding the return of the Individual Defendants' devices.  (*Id.*, at ¶ 6.)  At 8:31 p.m., the parties finally reached resolution on the protocol governing the collection, imaging, deletion, removal, and return of the devices.  (*Id.*)  Defendants' counsel provided all web-based and email accounts to Setec later that night, and the Individual Defendants dropped off their devices with Setec the next morning.  (*Id.*)  The Individual Defendants have been without access to all alleged trade secret and confidential information since then.  (*Id.*)

On the morning of Wednesday, May 13, 2020, Plaintiff's counsel sent an email to

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

5

2:20-CV-00920-KJM-DM
OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION

1   Defendants' counsel refusing to make any changes to the preliminary injunction.  (*Id.*, at ¶ 7.)

2   **IV.    THE CONDUCTING BUSINESS PROVISION IS VAGUE, STANDARDLESS,**

3   **AND SHOULD BE REJECTED FOR THAT REASON ALONE**

4          "[O]ne basic principle built into Rule 65 is that those against whom an injunction is issued

5   should receive fair and precisely drawn notice of what the injunction actually prohibits."  *Granny*

6   *Goose Foods v. Bhd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 444 (1974).  "The judicial

7   contempt power is a potent weapon. When it is founded upon a decree too vague to be understood,

8   it can be a deadly one."  *Id.*  "The most fundamental postulates of our legal order forbid the

9   imposition of a penalty for disobeying a command that defies comprehension."  *Id.  See also Union*

10  *Pac. R.R. v. Mower*, 219 F.3d 1069, 1077 (9th Cir. 2000) (injunction reversed and vacated because

11  "injunction issued against Mower does not even come close to satisfying Rule 65's  specificity

12  requirements; it provides little, if any, guidance to Mower regarding how he should determine what

13  particular information is confidential or privileged.").

14         Here, the Conducting Business Provision is terribly vague and unclear and gives the

15  Individual Defendants no notice of how it can comply with its terms.  Specifically, the proposed

16  injunction "enjoin[s] [the Individual Defendants] from **conducting business** with any individual

17  or entity that did business with ExamWorks before defendants stopped working there to the extent

18  those individuals or entities are identified in the trade secret materials misappropriated by

19  defendants, including, without limitation, ExamWorks' clients, medical providers, and doctors."

20  (Emphasis added.)  The term "conducting business" is outrageously vague, with no standards at all.

21  Does this prevent the Individual Defendants from receiving treatment from a doctor as a patient?

22  Does it prevent the Individual Defendants from paying an invoice from a hospital where a family

23  member stayed?

24         If the Proposed Injunction means that the Individual Defendants are enjoined from engaging

25  in commercial transactions with individuals and entities that "did business with ExamWorks"

26  before the Individual Defendants "stopped working there," then what exactly does that prohibit?

27  Can the Individual Defendants contact these individuals or entities about anything?  Can they

28  respond to inquiries?  Can they have conversations with these individuals or entities without

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

6

2:20-CV-00920-KJM-DM
**OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION**

1   violating the injunction?

2        The Conducting Business Provision, moreover, is not at all clear whether the Individual

3   Defendants are prohibited from doing any kind of business with these individuals or entities,

4   including transactions that **have nothing to do with** ExamWorks' business.  In other words, the

5   injunction is vague as to whether it prohibits the Individual Defendants only from engaging

6   commercial transactions with these individuals or entities that is competitive with ExamWorks (*i.e.*,

7   that deprives ExamWorks of an opportunity).  For example, if the Individual Defendants sold an

8   automobile to a doctor on the list, does that violate the injunction?  "Conducting business" is so

9   vague and incomprehensible that an injunction with such a term should not issue.  Instead, the terms

10  should be specifically defined to give the Individual Defendants notice and clear standards.

11       Finally, the Conducting Business Provision is impossible for the Individual Defendants to

12  comply with because it bars them from "conducting business" with an unknown set of individuals

13  and entities.   Specifically, the proposed injunction enjoins the Individual Defendants from

14  "conducting business" with "individuals or entities [that] are identified in the trade secret materials

15  misappropriated by defendants."   The Individual Defendants, however, no longer have any

16  ExamWorks materials at all.  They have all been provided to the mutually agreed upon forensic

17  neutral, and the Individual Defendants will never see those materials again.   Therefore, it is

18  impossible for the Individual Defendants to know whether any particular individual or entity is

19  contained on ExamWorks trade secret materials and can never be confident that they are complying

20  with this provision whenever they do business with anyone.  As a result, the Conducting Business

21  Provision is too vague as written to be issued.

22  **V.      THE CONDUCTING BUSINESS PROVISION IS BREATHTAKINGLY BROAD**

23       Injunctions issued after the misappropriation of trade secrets are simple in scope.  The

24  injunction should compel the return or destruction of the trade secrets in the defendant's possession,

25  and either enjoin the use of the trade secrets, or in the case of a customer list, enjoin the **solicitation**

26  of those customers.  A ban on the defendant doing business or accepting business is improper in

27  California, except with respect to customers whom the defendant had already solicited.  As a result,

28  the proposed injunction cannot prohibit the Individual Defendants from accepting business from

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

7

2:20-CV-00920-KJM-DM
**OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION**

1    the Covered Individuals or Entities.

2        A.    **The Proposed Injunction Cannot Prohibit The Individual Defendants From**

3              **Doing Any Business With Trade Secret Customers Unless They Have Also**

4              **Solicited Those Customers In Competition With ExamWorks**

5        ExamWorks asks this Court to issue an injunction that completely prevents the Individual

6    Defendants from doing any business with a list of customers it contends is a trade secret.  California

7    law, however, forbids the use of trade secret customer lists only to **solicit** those customers.  An

8    injunction cannot stop an individual from accepting business from a trade secret customer, unless

9    there is proof that the individual had already solicited that particular customer.  The Conducting

10   Business Provision, therefore, is unlawful and should not become part of the proposed injunction.

11       The case of *Gable-Leigh, Inc. v. North Am. Miss*, 2001 U.S. Dist. LEXIS 25614 (C.D. Cal.

12   Apr. 9, 2001) is very instructive here.  In that case, the plaintiff had "expended considerable money

13   and effort attracting potential contestants -- i.e., customers -- to the West Coast [beauty] Pageant."

14   *Id.*, at *4-5.  Specifically, the plaintiff sought to protect "9,000- and 900-name lists" of young

15   women that may be interested in applying to be contestants.  *Id.*, at *54.  The defendant, after

16   departing, "found approximately seventy-two names of customers with whom she had dealt at

17   Gable-Leigh, and sent materials to them."  *Id.*, at *9.  The plaintiff sought "a preliminary injunction

18   restraining defendants from soliciting, **contacting, or in any way conducting business with the**

19   **individuals identified on its lists**."  *Id.*, at 52 (emphasis added).

20       The court held that the plaintiff "will likely be able to establish that its customer lists are

21   trade secrets."  *Id.*, at *60.  Furthermore, the court found that the defendants had actually solicited

22   the customers on the trade secret list.  The defendant, in fact, "admit[ted] that she solicited seventy-

23   two of Gable-Leigh's customers."  *Id.*, at *61.

24       The court, however, refused to issue the injunction requested by the plaintiff.  The court

25   held that any injunction that issues "cannot be as broad as that Gable-Leigh seeks. Specifically, **it**

26   **is not appropriate to enjoin defendants from having contact with or in any way conducting**

27   **business with individuals whose names are on its customer lists**."  *Id.*, at *68 (emphasis added).

28   The court reasoned that "it is only the **solicitation** of customers that is forbidden by the UTSA."

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

8

*Id.*, at *68 (emphasis in original).  The court concluded that "while it is appropriate to enjoin defendants from doing business with those girls who have been wrongfully solicited, and from soliciting individuals whose names appear on Gable-Leigh's customer lists, if individuals other than the seventy-two young women already solicited seek out defendants' pageant, defendants should be free to enroll them as contestants."  *Id.*, at *69.

Another case rejecting the "conducting business" standard for customers who have not been solicited is *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514 (1997).  In that case, after "discuss[ing] the possibility of starting another roofing company," an employee defendant "resigned from Morlife," and "took his collection of customer business cards he had accumulated over his six years of employment."  *Id.*, at 1518.  "[T]he business cards represented approximately 75 to 80 percent of Morlife's customer base."  *Id.*

The defendant "contacted former Morlife customers seeking their business for his own newly formed company. In doing so, Perry used the customer business cards he took when he left Morlife. At the time of trial, Morlife identified 32 former customers who had switched their business to Burlingame."  *Id.*, at 1518.  After a trial, the defendants "were permanently enjoined from doing business with any of the 32 Morlife customers who subsequently did business with Burlingame after being unlawfully solicited," and "were also enjoined from soliciting any Morlife customer that [the employee defendants] became aware of while working at Morlife."  *Id.*, at 1519.

The court held that the "customer information at issue," including the "business cards removed from Morlife's premises," were entitled to trade secret protection.  *Id.*, at 1521, n.4, 1523.  The court further found that the evidence supported that the employees misappropriated these trade secrets by "engag[ing] in a general pattern of solicitation."  *Id.*, at 1527.

In reviewing the propriety of the injunction, the court held that "[w]hile California courts have shown a reluctance to impose an unconditional prohibition on doing business with customers of the former employer, they have prohibited the unlawful use of trade secrets to solicit those customers."  *Id.*, at 1524.  Accordingly, the court approved of the injunction's prohibition of the defendant from "doing business" with only those customers wrongfully solicited, and from

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

9

2:20-CV-00920-KJM-DM
OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION

1    soliciting other trade secret clients. *Id.*, at 1528.

2         Furthermore, in a case in this district, *Pyro Spectaculars North, Inc. v. Souza*, 861 F. Supp.

3    2d 1079 (E.D. Cal. 2012), the court also rejected a "doing business" standard for an injunction in a

4    customer list case.  In that case, the plaintiff "compiled its list of customers over the decades of its

5    business from advertising, website contacts, publicity, customer referrals, and other sources of leads

6    that have been gathered and forwarded to its account executives to make a sale for PSI." *Id.*, at

7    1082-83.   An employee resigned and subsequently "called, e-mailed, and visited several PSI

8    customers in person since he resigned from PSI, using [an] Excel database of PSI customer

9    information." *Id.*, at 1085-86.  "[I]n the weeks since defendant's resignation, at least 6 of

10   [plaintiff's] customers have or may have signed contracts with [defendant's] new employer." *Id.*,

11   at 1086.

12        When considering the scope of the injunctive relief, the court noted that it had "already

13   issued an interim injunctive order essentially requiring collection, production, and the subsequent

14   destruction of any remnants of all PSI documents, databases, and information in defendant's actual

15   or constructive possession." *Id.*, at 1093-94.  The plaintiff "further request[ed] that the court enjoin

16   defendant from doing business with any PSI customer he learned of through his employment at

17   PSI." *Id.*, at 1094.  The court refused to "impose the overbroad restriction proposed by PSI,

18   enjoining defendant 'from doing business with any PSI customer he learned of through his

19   employment at PSI.'"  The court reasoned that "[t]his is not a case involving a secret recipe or

20   formula, where the mere use of that recipe or formula in competition with a former employer in

21   itself would constitute misappropriation of a trade secret." *Id.*, at 1097.  Rather, "the identities and

22   contact information of PSI's customers are, in most cases, ultimately available to the public or a

23   competitor." *Id.*   As a result, the court found that "a narrow, time-limited non-solicitation

24   restriction is necessary to prevent defendant's misuse of PSI trade secret information in competing

25   with PSI." *Id.*

26        Finally, in *Strikepoint Trading, LLC v. Sabolyk*, 2009 U.S. Dist. LEXIS 140486, *5-6 (C.D.

27   Cal. Aug. 18, 2009), the plaintiff, after prevailing at trial, asked for an injunction that

28   (1) "enjoin[ed] Defendants from soliciting any of Plaintiff's clients served by [defendants] or

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

10

2:20-CV-00920-KJM-DM
OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION

1  whose names became known to the individual Defendants while they worked for Plaintiff,"
2  (2) "enjoin[ed] Defendants from **accepting any business** or account transfers from Plaintiff's
3  clients whom Defendants solicited at any time in the past [or] whom Defendants may have
4  contacted through the use of [such] information."  (Emphasis added.)  The court held that the
5  prohibition of "accepting any business" was improper, finding "that preventing the future
6  acceptance of business is too far-reaching with no new solicitous conduct." *Id.*, at *20.  The court
7  found that "other provisions of the injunction adequately protect Plaintiff (by, for example,
8  requiring Defendants to purge and return any misappropriated records)." *Id.   See also Merrill*
9  *Lynch, Pierce, Fenner & Smith, Inc. v. Garcia,* 127 F. Supp. 2d 1305, 1306 (C.D. Cal. 2000) ("In
10 fashioning a remedy for wrongful solicitation, California courts have enjoined defendants from
11 accepting business from customers who were wrongfully solicited…Accordingly, the Court finds
12 that Defendants may be enjoined from accepting business from any Merrill Lynch customers who
13 were wrongfully solicited.").

14      In this case, therefore, the Individual Defendants cannot be enjoined from "conducting
15 business" with any individual or entity whose business they have not solicited.  The mere
16 possession of a customer list is not a sufficient basis to preclude the Individual Defendants from
17 doing business from every customer on that list.  In each of the cases above, the defendants had
18 actually solicited a number of trade secret clients, and, even then, it was inappropriate to enjoin
19 them from doing business with trade secret clients whom they had not solicited.  As a result, the
20 Conducting Business Provision is unlawful and should not become a part of the proposed
21 Preliminary Injunction.

22      **B.      The Individual Defendants Cannot Be Prohibited From Reaching Out To**
23      **ExamWorks' Trade Secret Customers To Announce Their New Affiliations**

24      It is black letter law in California that even though a departing employee cannot solicit trade
25 secret clients he or she **is** permitted to **announce** his or her departure from an employer and his or
26 her new business.  *See MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir.
27 1993) ("[t]he [C]UTSA definition of 'misappropriation' has been clarified by case law which
28 establishes that the right to announce a new affiliation, **even to trade secret clients of a former**

1  **employer**, is basic to an individual's right to engage in fair competition, and that the common law

2  right to compete fairly and the right to announce a new business affiliation have survived the

3  enactment of the [C]UTSA.") (emphasis added); *Farmers Ins. Exch. v. Steele Ins. Agency, Inc.*,

4  2013 U.S. Dist. LEXIS 162575, *14 (E.D. Cal. Nov. 13, 2013) ("While an employee who leaves

5  his employer can 'announce his new affiliation' to his clients, the employee cannot

6  'actively solicit business for his new company' using the employer's trade secrets."); *Aerotek, Inc.*

7  *v. Johnson Grp. Staffing Co.*, 2013 Cal. App. Unpub. LEXIS 5424, *29 (Cal. Ct. App. Jul. 30,

8  2013) ("The fact Ponce made his announcement of new employment in person or by phone does

9  not, by itself, establish he impermissibly asked for business of these trade-secret-protected

10  companies.  Instead, the court must examine the totality of the circumstances to determine whether

11  the actions constitute a permissible announcement of new employment or an

12  impermissible solicitation of customers in violation of the UTSA."); *Interloc Solutions, Inc. v.*

13  *Tech. Assocs. Int'l Corp.*, 2007 U.S. Dist. LEXIS 66778, *4 (E.D. Cal. Aug. 23, 2007) ("While

14  Defendants may announce their new affiliation with a new employer, they may not

15  actively solicit Plaintiff's customers using any protected information."); *Hair Club for Men, LLC*

16  *v. Elite Solutions Hair Alternatives, Inc.*, 2007 U.S. Dist. LEXIS 30167, *6 (E.D. Cal. Apr. 5, 2007)

17  (citing *MAI Sys.* for proposition that announcement to, rather than a solicitation of, "trade secret

18  clients" is permissible under California law); *Hilb, Rocral & Hamilton Ins. Servs. v. Robb*, 33 Cal.

19  App. 4th 1812, 1821 ("In this case, even assuming that Hilb's customer list and other client

20  information constitute trade secrets--an issue we do not decide--the evidence before the trial court

21  does not support the conclusion that Robb misused them. He lawfully informed some of Hilb's

22  clients of his change in employment and then complied with their instructions to move their

23  accounts or to seek a quote on a desired type of insurance."); *American Credit Indemnity Co. v.*

24  *Sacks*, 213 Cal. App. 3d 622, 633-34, 36 (1995) ("even when a trade secret customer list exists, the

25  common law cases acknowledged a right to announce a new affiliation as contrasted with

26  a solicitation for patronage…At common law, the boundary separating fair and unfair competition

27  in the context of a protected customer list has been drawn at the distinction between an

28  announcement and a solicitation…These common law rules survive the enactment of the

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

12

2:20-CV-00920-KJM-DM
OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION

1    Uniform Trade Secrets Act.").

2       Accordingly, it is beyond dispute that any injunction that is issued cannot prevent the

3   Individual Defendants from making an announcement, even to trade secret clients, of their

4   departure from ExamWorks and a new business affiliation.

5       **C.**     **An Injunction Should Not Prohibit Even The Solicitation Of All Individuals Or**

6          **Entities On ExamWorks' Customer List**

7       As demonstrated above, the proposed injunction cannot prohibit the Individual Defendants

8   from accepting business from or announcing their new affiliations to trade secret clients.  The most

9   restrictive limitation on the Individual Defendants' communication with trade secret clients is a

10   prohibition of solicitation.  There are, however, several reasons that a blanket prohibition on

11   solicitation of all Covered Individuals or Clients is improper.

12       **1.**     **The only evidence that ExamWorks' customer lists are trade secrets is**

13          **the value of the information contained on the customer lists, and not the**

14          **identities of the customers themselves**

15       ExamWorks has made it clear that the value of its customer lists is not in the identities of

16   the Covered Individuals and Entities, but rather the information stored about them.  This is what

17   ExamWorks points to as the valuable information making its databases and spreadsheets a trade

18   secret.  ExamWorks even acknowledges that the identities of these Covered Individuals and Entities

19   is easily discoverable.  Thus, while the Individual Defendants can be enjoined from soliciting the

20   Covered Individuals and Entities with the information about them contained in its records, they

21   should not be enjoined from merely contacting the Covered Individuals and Entities to solicit them

22   for business using public resources and their long-standing relationships with and knowledge of the

23   legal and medical community in this industry.

24       ExamWorks asserts that its "services include IMEs and Qualified Medical Evaluations

25   (QMEs), which are the bulk of ExamWorks' business in California."  (Doc. No. 4-1 at 2.)

26   ExamWorks boasts of its "custom-built and proprietary software…called 'IMEC' [that] store[s] all

27   of its case information, client profile information, and medical provider profile information."  (*Id.*,

28   at 3.)  "IMEC contains (1) records on nearly three million cases in the United States and Canada;

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

13

2:20-CV-00920-KJM-DM
OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION

1    (2) detailed information about medical providers, including financial history, reimbursement rates,

2    and contact information; (3) detailed information on SIBTF exams; and (4) contact information for

3    attorneys, adjusters, and third-party administrators (who refer cases to ExamWorks)." (*Id.*, at 3.)

4        ExamWorks, in fact, distinguishes "[t]he information that [it] maintains on its clients and

5    doctors [from what is] available publicly in an easily accessible format, such as an internet search."

6    (*Id.*)  ExamWorks even acknowledges that it is, not the contact information itself, but rather the

7    "[d]etailed information about ExamWorks' clients and doctors [that] can be used to compete for

8    those relationships and undermine the millions of dollars ExamWorks has invested in cultivating

9    them." (*Id.*, at 4.)

10       ExamWorks highlights that the value of the IMEC is the information about cases.  "Where

11   a case is ongoing, particularly one that spans many years, the business is poachable, and having

12   comprehensive information about the case would allow a competitor to target that business with

13   little effort or investment of its own." *Id.*  "[A] competitor with specific case information would

14   have a roadmap to a developed business that it could steal from ExamWorks by slightly overbidding

15   ExamWorks' physician payments." *Id.  See also id.* ("Detailed information about ExamWorks'

16   clients and doctors can be used to compete for those relationships and undermine the millions of

17   dollars ExamWorks has invested in cultivating them.").

18       ExamWork's admission that the contact information in its "client and doctor lists" does not

19   drive the value of the trade secret is in the following passage:

20       Although the names of ExamWorks clients and medical providers may be generally

21       known in the broadest sense (*e.g.,* the doctors and companies listed can be found

22       on an individual basis), the stolen lists contain significant amounts of nonpublic

23       information including specific contact names and information about ExamWorks

24       clients and can be used to reverse engineer ExamWorks' business. Such lists are

25       routinely found to constitute trade secrets because they are expensive to create—

26       here, reflecting years and thousands of hours of effort—and couple publicly

27       available information with nonpublic information developed through substantial

28       investment

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

14

2:20-CV-00920-KJM-DM
OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION

1   (*Id.*, at 12.)  The Individual Defendants no longer have any of this information.  All of their devices

2   and accounts have been provided to a forensic neutral who is currently imaging those devices for

3   discovery.  (Chammas Decl., ¶ 6.)  In any event, the Individual Defendants are not opposing the

4   provision in the proposed Injunction that enjoins them from using any ExamWorks information,

5   including spreadsheets, doctor and clients lists, and the IMEC.

6          What the Individual Defendants do oppose is the proposed injunction's prohibition on them

7   contacting more than 100,000 doctors and attorneys just because they may also be on ExamWorks

8   spreadsheets.  The State of California puts on-line a Qualified Medical Evaluator database that

9   allows anyone to search such doctors by specialty and location and to obtain their contact

10  information.  (*See* https://www.dir.ca.gov/databases/dwc/qmestartnew.asp.)  Similarly, finding an

11  attorney specifically representing applicants in the workers' compensation world is also a matter

12  of public record, as the California Applicants' Attorneys Association, "the most powerful, and most

13  knowledgeable legal voice for the injured workers of California," provides a database of applicant

14  attorneys,    searchable    by    location    and    specialty.    (*See*    https://www.caaa.org

15  /index.cfm?pg=FindaLawyerDirectory.)

16         Therefore, the Individual Defendants' solicitation of doctors, medical providers, attorneys,

17  and insurance carriers, without using any ExamWorks' material, is not a misappropriation of trade

18  secrets, notwithstanding the fact that these same contacts may coincidentally be on ExamWorks'

19  customer lists.  The Individual Defendants, in lawful competition with ExamWorks, may certainly

20  use these public sources of information to find and solicit a potential customer.

21         **2.      The Individual Defendants should be able to solicit any Covered**

22              **Individual or Entity that they knew about prior to working at**

23              **ExamWorks**

24         Girard and Baldini, before they worked at ExamWorks, had an extensive background and

25  vast experience in the medical-legal world with substantial relationships with doctors, lawyers, and

26  insurance carriers.  Their source of knowledge to compete in this field predates ExamWorks, and

27  their ability to identify a group of potential customers—without any ExamWorks material—cannot

28  be doubted.  Baldini, for example, spent almost 20 years in the health care and medical-legal

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

15

2:20-CV-00920-KJM-DM
OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION

industry, developing hundreds of relationships with doctors, attorneys, and vendors, and working with virtually every insurance company in the California Workers' Compensation and personal injury space. (Baldini Decl., ¶ 3.)    Similarly, Girard has worked with insurance companies generally since 1984, in the legal industry since 1996, and workers' compensation claims specifically since 1999, developing strong relationships with workers' compensation referral sources and major insurance companies. (Girard Decl., ¶ 4.) The Conducting Business Provision improperly cuts off the Individual Defendants' ability to compete with ExamWorks and to solicit customers through the use of non-trade secret information they have acquired before working at ExamWorks and generally in the industry.  A provision forbidding solicitation of ExamWorks' customers, in fact, precludes the Individual Defendants from soliciting any of the more than 100,000 Covered Individuals or Entities, even if the Individual Defendants knew of or had a relationship with them independent of ExamWorks.

### 3.   An Individual Defendant should be able to solicit any Covered Individuals and Entities with whom his or her current employer has an independent relationship

Three of the Individual Defendants work for new employers.  Baldini and Girard work for IPM, and Tejada works for Dunamis.  (Girard Decl., ¶ 5; Baldini Decl., ¶ 4; Tejada Decl., ¶ 6.) IPM and Dunamis have pre-existing relationships with a variety of doctors, medical providers, insurance carriers, and lawyers, established well before and independent of when the Individual Defendants came to work for them.  (*Id.*)  As explained above, the Individual Defendants absolutely should not be precluded from "conducting business" with any individual or entity, but they should certainly be permitted to solicit business from any individual or entity that IPM or Dunamis knows about or already does business with.   Plainly, such solicitation would not misappropriate ExamWorks' alleged trade secrets or customer lists, as the Individual Defendants would merely be acting in the course and scope of their employment, working with a customer through fair and lawful means.

///

//

**4.     The Individual Defendants should be able to solicit any Covered Individual or Entity for work for their new employer that does not compete with ExamWorks**

Even if the Individual Defendants cannot solicit Covered Individuals or Entities for business that competes with ExamWorks, they should be able to solicit Covered Individuals or Entities for business that does not compete with ExamWorks.  Baldini and Girard work now for IPM, of which 97 percent of its business is "treating a patient in the ordinary course of business as a primary treating physician in connection with litigation or workers' compensation or disability claims." (Girard Decl., ¶ 5; Baldini Decl., ¶ 4.) ExamWorks, by contrast, "primarily does forensic evaluative medical services in connection with litigation or workers' compensation or disability claims."  (*Id.*) In other words, IPM provides a primary treating physician to treat a patient in connection with a litigation, and ExamWorks provides a physician to examine a patient during and for purposes of a litigation assessment.  (*Id.*)

Tejada's work for Dunamis, moreover, is even more unrelated to ExamWorks.   For Dunamis, Tejada acquires medical records from workers' compensation/personal injury law firms, creates and shares educational videos, hosts educational seminars, arranges for, assists with, and engages interpreters, and performs all services related to vocational experts.  (Tejada Decl., ¶ 6.) Tejada, moreover, in her current job, solicits business from workers' compensation / personal injury law firms to supply medical records to them.  (*Id.*)  In this regard, Dunamis provides the entire staff with a copy of the publicly available EAMS names database list [link: https://www.dir.ca.gov/ ftproot/EAMSReps.txt].  (*Id.*)  This database contains over 8,300 law firms, claims administrator, and lien claimants.  The Dunamis staff, including Tejada, then reach out via email and telephone to promote Dunamis Alliance's medical records acquisition service.  (*Id.*)  Tejada does not know and never has heard of the overwhelming majority of these law firms.  (*Id.*)  Putting aside the fact that the mere presence of one of the law firms on ExamWorks' customer lists should in no way effect Tejada's right to use this public database to solicit business, this solicitation does not even compete indirectly with ExamWorks.  Dunamis does not engage physicians to provide forensic evaluative medical services, and anything Dunamis does is no more than incidental to what

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

17

2:20-CV-00920-KJM-DM
OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION

1   ExamWorks does.  (*Id.*)

2       Therefore, there is no reason why the three Individual Defendants should not be permitted

3   to solicit customers in furtherance of their new employer's business unrelated to ExamWorks.

4   **VI.   THE COST OF THE FORENSIC NEUTRAL SHOULD BE PAID FOR BY**

5       **EXAMWORKS   BECAUSE   IT   IS   THE   PARTY   PROPOUNDING   THE**

6       **DISCOVERY  AND  BECAUSE  ITS  RESOURCES  DWARF  THOSE  OF  THE**

7       **INDIVIDUAL DEFENDANTS**

8       ExamWorks insisted on and is currently directing a forensic expert solely to process its own

9   electronic discovery requests.  (Dock. No. 17.)  ExamWorks has asked this expert to collect 21

10  devices and the login credentials associated with 13 email, cloud, or web based accounts.

11  (Chammas Decl., ¶ 6.)  ExamWorks is requiring this expert to image all accounts and devices,

12  remove all ExamWorks material from said devices and accounts (not just confidential material),

13  and conduct searches on each account and device with dozens of search terms.  (*Id.*, ¶ 8.)

14  ExamWorks is also reserving the right to request that the expert conduct additional searches.  (*Id.*)

15      The Individual Defendants should not pay for what is effectively ExamWorks' expert,

16  particularly in the beginning of the litigation.  Although the expert was selected by both sides, the

17  Individual Defendants are not asking for this expert and certainly are not requesting that the expert

18  perform any work.  As the party effectively propounding this discovery, ExamWorks should be

19  responsible for all attendant costs associated with that discovery.  *See Saucedo v. Brazelton*, 2015

20  U.S. Dist. LEXIS 96361, *12 (N.D. Cal. Jul. 21, 2015) ("[E]ach party seeking discovery is expected

21  to bear any special attendant costs.").

22      Furthermore, Defendants are individuals with limited resources, are not equipped to

23  bankroll ExamWorks' appetite for electronic discovery, and are experiencing extreme financial

24  hardship because of the litigation.  (Girard Decl., ¶ 7; Baldini Decl., ¶ 5; Tejada Decl., ¶ 7.)

25  ExamWorks, meanwhile, is an extraordinarily wealthy corporation, with billions of dollars in

26  annual sales.  (Girard Decl., ¶ 6.)  ExamWorks should not be permitted to weaponize electronic

27  discovery to potentially bankrupt the Individual Defendants.

28  ///

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

18

2:20-CV-00920-KJM-DM
**OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION**

At a minimum, the Individual Defendants should pay for no more than the cost of the expert to collect and image the devices, and then remove ExamWorks information from them. ExamWorks should pay for any work after that in its entirety, such as running searches across the various databases and devices and any other tasks ExamWorks elects to have done.

## VII.   ABYGAIL BIRD PROVIDED ADMINISTRATIVE SUPPORT TO GIRARD AND IS ALLEGED TO HAVE DONE NOTHING MORE THAN SEND A SINGLE EMAIL TO HIM

Apparently because ExamWorks wanted to be thorough, it elected to sue Bird because she sent an email to her boss.  Girard specifically asked Bird to send him an email on December 2, 2019—more than three months before he resigned—attaching a company spreadsheet that ExamWorks alleges is a trade secret.  (Girard Decl., ¶ 3; Bird Decl., ¶ 2-4.)  ExamWorks has no evidence that Bird had any intent or knowledge as to why her boss requested the spreadsheet, or that Bird committed any other act or showed any awareness of intent to compete against ExamWorks or to harm it in any way.  Bird, in fact, was required to follow her boss's instructions, and could have been disciplined if she refused to send him a work document.  (*Id.*)  When he asked Bird to send the spreadsheet, he did not tell her what it was for, he never involved her in any plans post-ExamWorks, and she had no reason to know that the other Individual Defendants planned to resign.  (*Id.*)  Bird, in fact, was never part of the other Individual Defendants' plan to leave ExamWorks, but was terminated apparently for sending that email.  (*Id.*)  No injunction should be issued against Bird in light of the lack of evidence against her.

## VIII.   PAMELLA TEJADA DID NOT ENGAGE IN ANY WRONGDOING AND MERELY LEFT EXAMWORKS TO WORK FOR A COMPANY THAT DOES NOT COMPETE WITH EXAMWORKS

ExamWorks has no evidence that Tejada did anything wrong.  Tejada was not involved in any of the planning with Girard and Baldini to compete (Tejada Decl., ¶ 2; Girard Decl., ¶ 2), and she was first approached by Girard and Baldini about working for a medical records acquisition company in January 2020 (*id.*).

Like with Bird, ExamWorks can point to only a single email Tejada sent to herself, months

FORD & HARRISON
LLP
ATTORNEYS AT LAW
LOS ANGELES

19

2:20-CV-00920-KJM-DM
OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION

before she resigned.  However, Tejada sent herself that email as part of her work for ExamWorks. (Tejada Decl., ¶ 8.)  Tejada was visiting a law firm (Brown & Todoroff) for ExamWorks, and needed the law firm's spreadsheet of its pending cases for her meeting.  (*Id.*)  Normally, Tejada could just use the internet to access the spreadsheet, but given the potentially spotty connection because of where that law firm was located, Tejada downloaded the file on to her computer desktop for her meeting.  (*Id.*)  At the meeting, Tejada used the spreadsheet to show the law firm its cases and how ExamWorks could help it.  (*Id.*)  This was the only reason that Tejada emailed herself the spreadsheet and that was the only time she used it.  (*Id.*)  Accordingly, ExamWorks has no evidence that Tejada engaged in unlawful conduct at all, and certainly none warranting an injunction.

## IX.   <u>CONCLUSION</u>

For the foregoing reasons, the Individual Defendants do not dispute that the proposed injunction should be issued against only Baldini and Girard, with the following modifications: the Conducting Business Provision be eliminated entirely or substantially modified as explained above, and the cost of the forensic expert should be borne entirely by ExamWorks or the Individual Defendants should pay only for the collection and imaging of the relevant devices and the removal of any ExamWorks information from said devices.  No injunction should be issued against Bird or Tejada.

Dated:  May 15, 2020                                    Ford & Harrison LLP


                                                         By:  */s/ Daniel B. Chammas*
                                                         Daniel B Chammas
                                                         Attorneys for Defendants

Ford & Harrison
LLP
Attorneys At Law
Los Angeles

20

2:20-CV-00920-KJM-DM
OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION

# PROOF OF SERVICE

I, Lillian Marquez, declare:

I am a citizen of the United States and employed in Los Angeles County, California.  I am over the age of eighteen years and not a party to the within-entitled action.  My business address is 350 South Grand Avenue, Suite 2300, Los Angeles, California 90071.

On May 15, 2020, I electronically filed the attached document:

**OPPOSITION TO OSC RE: PRELIMINARY INJUNCTION**

☒   **ELECTRONICALLY:**  I caused a true and correct copy thereof to be electronically filed using the Court's Electronic Court Filing ("ECF") System and service was completed by electronic means by transmittal of a Notice of Electronic Filing on the registered participants of the ECF System.

Robert S. Shwarts                 Attorneys for Plaintiff,
Catherine Y. Lui                  EXAMWORKS, LLC
Nathan Shaffer
Johanna Jacob
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Tel.: (415) 773-5700
Fax: (415) 773-5759
Email(s):    rshwarts@orrick.com
              clui@orrick.com
              nshaffer@orrick.com
              jjacob@orrick.com

☒   **FEDERAL:**  I declare that I am employed in the office of a member of the State Bar of this Court at whose direction the service was made. I declare under penalty of perjury under the laws of the United States of America and State of California that the above is true and correct.

Executed on May 15, 2020, at Los Angeles, California.

_____
Lillian Marquez