ROBERT S. SHWARTS (STATE BAR NO. 196803)
rshwarts@orrick.com
CATHERINE Y. LUI (STATE BAR NO. 239648)
clui@orrick.com
NATHAN SHAFFER (STATE BAR NO. 282015)
nshaffer@orrick.com
JOHANNA JACOB (STATE BAR NO. 286796)
jjacob@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:	+1 415 773 5700
Facsimile:	+1 415 773 5759

Attorneys for Plaintiff
ExamWorks, LLC

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| EXAMWORKS, LLC, a Delaware limited liability company,<br><br>              Plaintiff,<br><br>     v.<br><br>TODD BALDINI, an individual, ABYGAIL BIRD, an individual, LAWRENCE STUART GIRARD, an individual, PAMELLA TEJADA, an individual, ROE CORPORATION, and DOES 1 through 10,<br><br>              Defendants. | Case No. 2:20-CV-00920-KJM-DB<br><br>**EXAMWORKS' REPLY IN SUPPORT OF A PRELIMINARY INJUNCTION**<br><br>Date:        May 22, 2020<br>Time:       10:00 a.m.<br>Courtroom: 3, 15th Floor<br>Judge:      Hon. Kimberly J. Mueller |

I.  **DEFENDANTS CONCEDE THAT ALL FACTORS FAVOR GRANTING A PRELIMINARY INJUNCTION.**

Defendants do not contest that they stole trade secret information from ExamWorks as part of a long-running scheme to incubate a competitive company dubbed "Project Palo Alto" from within ExamWorks and, when the time was right, launch the competing company in stealth mode and compete against ExamWorks using stolen proprietary information and trade secrets. *See* ECF No. 4-1 (MPA ISO Motion, or the "Mot.") at 6–7 (describing evidence related to Project Palo Alto); *see* Opp'n Br. at 1 ("Todd Baldini and Stuart Girard do not dispute that they took ExamWorks information while they were still employed at ExamWorks."), at 19–20 (conceding that Bird and Tejada sent information to unauthorized accounts). Defendants do not dispute that the information they stole to support their scheme constitutes trade secrets. *See, e.g.*, Opp'n Br. at 1 (recognizing that "information [ExamWorks] has compiled over the years about [its] clients would allow a competitor to threaten its business"), at 7 (acknowledging that "individual or entity" information "contained on ExamWorks trade secret materials" is at issue in this case). Defendants concede that the point of all of this was to compete directly with ExamWorks. *E.g.*, ECF No. 26-2 (Girard Decl.) ¶ 2 ("Todd Baldini and I talked about leaving ExamWorks and starting a new company to compete in the medical-legal field."); ECF No. 26-5 (Baldini Decl.) ¶ 2 (same); ECF No. 26-3 (Tejada Decl.) ¶ 3 (same); *see also, e.g.*, *Cutera, Inc. v. Lutronic Aesthetics, Inc.*, No. 2:20-cv-00235-KJM-DB, 2020 WL 1234551, at *8 (E.D. Cal. Mar. 13, 2020) (finding irreparable harm from unlawful competition using stolen trade secrets). Defendants do not dispute the balance of equities or public interest factors at all. On this record, there is no doubt that an injunction should issue pending trial to prevent irreparable harm to ExamWorks arising from Defendants' misappropriation.

The weight of the evidence shows that Defendants put their plan into motion by stealing ExamWorks' trade secrets and taking up employment with their new business partners at Dunamis Alliance (Tejada) and IPM Medical (Girard and Baldini). Indeed, their initial planning documents specifically suggested that the plan was to initially separate to different companies and, when the heat associated with the misappropriation died down, merge them into one company. ECF No. 21-2 (Holley Decl.) Ex. A at ¶ 6 ("Todd runs both … with merger of the two as timely and

1    appropriate"), Ex. E at 3 ("Use Existing Entity: **IPM**" (emphasis added)).

2    Despite these concessions, Defendants seek to nonetheless benefit from their misappropriation by permitting significant and wholly unlawful competition to proceed against ExamWorks, relying primarily on duplicitous factual representations and misstatements of law. Most troubling is that Defendants provide no assurance under oath that they have divested themselves of ExamWorks' trade secrets despite entry of the Court's order on May 8, 2020, requiring them to do so within 48 hours. ECF No. 17 (Ord. re TRO & OSC) at 3–4. Although their attorney declares that devices were turned over, Opp'n Br. at 15, he is not a competent witness to say what was and was not stolen and returned by Defendants. *Not one* Defendant declares that they returned everything they took. And Defendants' silence on this point is deafening in light of their plan to conceal and, if necessary, incur substantial legal fees, defending their misappropriation. ECF No. 21-2 (Holley Decl.) Ex. E at 3–4 ("Baldini and Girard Exit Plans … who first, when, how and why?" and "Startup Costs … Legal fees"). Equally concerning is that despite being ordered by the Court to turn over all relevant electronic devices so that they could be examined by a neutral *prior* to the May 22 hearing on this motion, Defendants' counsel repeatedly stonewalled such that not one device has been searched as of filing. Supp. Lui Decl. ¶¶ 2–11. ExamWorks has no idea the extent of the theft, where the stolen information was sent, how it was used, and what remains in Defendants' hands. The scope of the devices that Defendants have submitted to the forensic neutral is staggering with Girard alone returning 11 USB devices. Lui Decl. Ex. I.[1] Defendants' misconduct makes clear they cannot be trusted, and the full scope of the injunction is required.

Defendants' arguments in opposition focus exclusively on "non-solicitation" case law involving theft of customer lists. But this *is not* just a customer list case and it *is not* just a non-solicitation case. Defendants stole ExamWorks' internal "invaluable playbook" for the "lucrative expanding SIBTF business area" and other internal business methods and strategies, including documents that provide a guide "for who to immediately target," guides to what business "may be easily poached," and internal financials and budgeting about how to structure an effective business using ExamWorks' methods. ECF No. 4-5 (Nalley Decl.) ¶¶ 6, 31–33. This case is much more

---

[1] When information germane to this motion is produced, ExamWorks will inform the Court.

similar to one where a confidential method or technology is stolen—the secret recipe or the secret sauce to the business—which justifies enjoining the competing business beyond mere solicitation. *E.g.*, *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) (affirming a worldwide injunction on doing the business associated with misappropriated trade secrets); *MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 515 (9th Cir. 1993) (affirming injunction against "maintaining any contract with any former MAI computer maintenance customer" where knowledge of the customer was obtained through employment with plaintiff).

## II.     THE INJUNCTION MEETS THE SPECIFICITY REQUIREMENTS OF RULE 65.

Rule 65 does not require a court to "catalog the entire universe" of possible conduct that conceivably falls under an injunction's prohibitions. *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1211 (9th Cir. 2000). It is enough that the injunction is "sufficiently clear to protect [the plaintiff's] interests and to provide [the defendant] with adequate notice." *Id.* And where the parties are in direct competition, a defendant enjoined from infringing or misusing the plaintiff's intellectual property "should not be held to answer the infringer's subjective assertion that it cannot understand how best to comply with an injunction." *Id.*

Defendants' claim that the injunction is unclear contradicts authority approving similar language. This Court recently enjoined a trade secret defendant from "using the …Trade Secret information for the purpose of directly or indirectly soliciting, and for the purpose of ***conducting business*** with, any … actual or potential customer with whom any of the Former Cutera Employees had business contact or communications." *Cutera*, 2020 WL 1234551, at *11 (emphasis added); *MAI Sys.*, 991 F.2d at 515 (affirming injunction against "maintaining any contract with any former MAI computer maintenance customer where knowledge of any such customers was obtained by Francis during his employment with MAI"). Even Defendants' authority uses similar language—*Gable-Leigh* issued an injunction against "**conducting business** with any individuals" on trade secret lists. *Gable-Leigh, Inc. v. N. Am. Miss*, No. CV 01–01019 MMM(SHX), 2001 WL 521695, at *20 (C.D. Cal. Apr. 13, 2001) (emphasis added) (cited in Opp'n Br. at 8–9). The phrase's meaning is clear—"conducting" means "to direct or take part in the operation or management of" and "business" means "a commercial or sometimes an industrial enterprise." Supp. Lui Decl.

Ex. K. It is not credible that Defendants do not understand plain English.

## III.  THE BREADTH OF THE INJUNCTION IS TAILORED TO THE HARM.

Defendants do not contest the propriety of injunctive relief, contesting only the scope of the requested injunctive relief. But in arguing for a narrower scope, they fail to account for the sheer breadth of their misappropriation as well as myriad cases granting injunctions that are as broad as the one requested here but remedied much less egregious misappropriations. Defendants' primary argument is that California law "forbids [only] the use of trade secret customer lists to **solicit** those customers," Opp'n Br. at 8, which is a flat misstatement of law because where stolen trade secrets consist of *more* than customer lists, broader injunctions are routinely entered.

Defendants rely heavily on *Morlife, Inc. v. Perry*, Opp'n Br. at 8–9, but that case issued a *broader* injunction than the one requested here for a much more *limited* misappropriation. 56 Cal. App. 4th 1514 (1997). *Morlife* involved the theft of business cards by a departing employee that represented "75 to 80 percent of Morlife's customer base." *Id.* at 1518. The appellate court in *Morlife* upheld an injunction that prohibited the former employee from not only "*doing business* with any of the 32 entities who switched their business from Morlife to Burlingame after being unlawfully solicited," but also from "*soliciting* any business from *any* entity that did business with Morlife before [defendants] stopped working there, provided they obtained knowledge about the customer during the course of their employment at Morlife." *Morlife*, 56 Cal. App. 4th at 1527–28 (some emphasis added). The injunction was upheld because "[t]he restrictions imposed by the court in granting injunctive relief do not appear to be broader than authorized by the governing statute and appear to be in complete conformance with similar restrictions court[s] have enforced in the past." *Id.* at 1528. Defendants, in contrast to the comparatively amateur misappropriation in *Morlife,* managed to steal **100%** of ExamWorks' customer base *and* **100%** of its physician records—*nationwide*. *See, e.g.*, ECF No. 4-5 (Nalley Decl.) ¶ 28. Defendants also stole much more than customer contact lists, including internal business plans, active cases and readily poachable business, and internal strategy documents that together amounted to a complete confidential playbook for replicating ExamWorks' business. *See* Mot. at 7–9 (describing breadth of misappropriation). Even so, the injunction requested here is narrower than in *Morlife* because it

1   is limited to individuals and entities *actually identified* in the stolen trade secrets (not any
2   ExamWorks customer at all, like *Morlife*)—and Defendants should not be allowed to complain
3   about breadth where the relief is a direct result of the massive scale of their unlawful conduct.

4   Courts have granted similar injunctions. *MAI Systems* approved an injunction prohibiting
5   the defendant from "maintaining any contract where customer information was obtained" while the
6   defendant was "employed by MAI." 991 F.2d at 514. There, like here, the trade secrets came from
7   a massive database of proprietary and confidential customer information, and a broad prohibition
8   on doing business with misappropriated customers was appropriate. *Id.* at 521 (describing the
9   misappropriated database). Similarly, this Court granted an injunction that prohibited the
10  defendants from "conducting business" with the plaintiff's actual or prospective customers to which
11  the defendants were exposed in the preceding year. *Cutera*, 2020 WL 1234551, at *11. Here, the
12  scope of such an injunction happens to cover *all* ExamWorks' clients and physicians because
13  Defendants sought out and stole ExamWorks' *entire* client and physician record in December 2019.
14  ECF No. 4-5 (Nalley Decl.) ¶ 28. Again, these injunctions are not outliers. *See, e.g.*, *Merrill Lynch,*
15  *Pierce, Fenner & Smith Inc. v. Chung*, No. CV 01–00659 CBM RCX, 2001 WL 283083, at *7
16  (C.D. Cal. Feb. 2, 2001) (enjoining defendants from "accepting any business, including account
17  transfers, from any customer whose records or information Defendants used in violation of their
18  contractual and trade secret obligations … and any customer whom Defendants may have contacted
19  through the use of information by Defendants while in the employ of Plaintiff").

20  Defendants' authority is distinguishable because those cases involved only customer lists
21  (which are by themselves trade secrets), but nothing similar to the internal business playbook trade
22  secret misappropriated by Defendants in this case. *Gable-Leigh* involved a list of 72 names that
23  the defendant cobbled together from her "address book, post-its and other papers" that happened to
24  overlap with 900 names on the plaintiff's secret customer list. 2001 WL 521695, at *2–*3. Even
25  so, the defendant was enjoined from soliciting any name on the plaintiff's lists (which, other than
26  the 72, were not stolen) and doing *any* business with the 72 individuals she could remember. *Id.* at
27  *20. *Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079 (E.D. Cal. 2012) was also about a
28  customer list, and not the kind of internal strategic playbook information at issue here. *See* Opp'n

1   Br. at 10 (describing *Souza*).  *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Garcia*, 127 F. Supp.
2   2d 1305, 1305–07 (C.D. Cal. 2000), is inapposite because it is unclear if anything was stolen at
3   all—the injunction was based on the bare fact that defendants contacted the plaintiff's clients
4   (possibly from memory) and asked if they wanted to do business.

## IV.  THE INJUNCTION DOES NOT PREVENT LAWFUL ANNOUNCEMENTS.

Defendants argue that they can lawfully announce their new employment so long as they do not use stolen trade secrets to do so.  Opp'n Br. at 12–13.  True, but so what?  Defendants do not need an exception in the preliminary injunction because nothing in it precludes lawful conduct—indeed, Defendants Tejeda and Girard have already announced their new affiliations online despite issuance of the Court's restraining order on May 8, 2020.  *See* ECF No. 21-1 (Lui Decl.) Exs. A–B.  The Court should not, however, countenance any modification that would allow Defendants to engage in *unlawful* conduct by using misappropriated trade secrets to compete against ExamWorks, particularly given the evidence that doing so was their plan all along.  *E.g.*, ECF No. 21-2 (Holley Decl.) Exs. D, E, and O (describing competing business plans).

## V.  DEFENDANTS' REQUEST TO SOLICIT EXAMWORKS' CUSTOMERS IS AN UNLAWFUL MISAPPROPRIATION THAT MUST BE ENJOINED.

Despite conceding that Defendants unlawfully misappropriated ExamWorks' trade secrets and spending pages recognizing that solicitation of a former employers' trade secret clients is unlawful, Opp'n Br. at 8–11, Defendants incredibly seek permission from this Court to do just that on four flawed bases:  1) the unsupported claim that the misappropriated trade secrets are limited to customer lists; 2) the unsupported claim that Defendants Baldini and Girard have contacts in the industry that predate employment with ExamWorks; 3) the unsupported claim that IPM, Baldini, and Girard's new employer may have an as-yet unspecified preexisting relationship with unspecified ExamWorks' customers; and 4) the incorrect claim that Defendants' new employers do not "compete" with ExamWorks.  Opp'n at 13–18.  None of these contentions have merit and amount to a request to continue their scheme and profit from the misappropriation.

**1.**  On the first point raised by Defendants, there is ample evidence that Defendants stole much more than customer lists, and there is zero competent evidence in the record that supports

Defendants' argument that they have divested the misappropriated trade secrets. *See* Opp'n Br. at 15 (claiming, without evidence, that defendants "no longer have any of this information"). Although each Defendant submitted a sworn declaration, not one of them is willing to declare under penalty of perjury that they no longer have ExamWorks' trade secrets. Girard and Baldini each concede that they "regrettably" stole information, but nowhere testify they have returned stolen property. ECF No. 26-2 (Girard Decl.) ¶ 2; ECF No. 26-2 (Baldini Decl.) ¶ 2. Tejada, despite acknowledging Baldini and Girard let her in on their scheme in January 2020 and that she violated company policy and her employment agreements by emailing confidential information to her personal email account, denies all wrongdoing based on a claim that she did so to visit a law firm in a "small town" that might not have "an internet connection." ECF No. 26-4 (Tejada Decl.) ¶ 8. A review of the document shows that the story does not make sense because there are two different law firms listed in the stolen information. ECF No. 21-2 (Holley Decl.) Ex. AA (Filed Under Seal). Bird simply denies all wrongdoing because Girard asked her to steal information but has no explanation for why she had this sensitive information in the first place. ECF No. 26-3 (Bird Decl.).

**2.** On the second point, Baldini and Girard argue they should get a pass on the misappropriation because they have preexisting industry connections. There is no evidence to support this claim. Baldini's LinkedIn profile shows that he was a chiropractor before starting his position with ExamWorks (through a predecessor company). Supp. Lui Decl. Ex. L. Girard's LinkedIn profile lists two jobs—his job with ExamWorks (also begun with a predecessor company) and his current position with IPM Medical Group. ECF No. 21-2 (Lui Decl.) Ex. B. Neither Tejada nor Bird claim to have any preexisting industry knowledge. *See* ECF No. 26-4 (Tejada Decl.); ECF No. 26-3 (Bird Decl.). Moreover, the case law is clear that they *cannot* rely on preexisting industry knowledge to solicit business from the very ExamWorks' customers that were part of the misappropriation. *See, e.g.*, *Cutera*, 2020 WL 1234551, at *6, *11 (granting an injunction against direct or indirect solicitation of prior employer's customers based on evidence that competitively sensitive files were copied by departing employees). It barely needs to be said, but if Girard and Baldini had preexisting industry connections that they intended to use in their new business, then why did they spend 18 months pilfering that exact information from ExamWorks?

**3.**  On the third point, Defendants suggest that they should be permitted to "solicit" clients and physicians that were included in the misappropriated materials if their new employers, IPM and Dunamis, "knows about or already does business with" them.  Opp'n at 16.  This is a loophole big enough to drive a truck through.  Individual names of ExamWorks' clients and doctors may be public in the sense they are listed in the phone book (although not necessarily with any affiliation to ExamWorks), so literally every single stolen client and doctor is arguably "known" to IPM and Dunamis.  But the stolen trade secrets include more than client lists—the data stolen by Defendants comes from a large database and includes targeted and discrete contact information, information about individuals' roles, and credentials as relevant to ExamWorks' business—none of which is public.  *See* Mot. at 3–4.  Defendants cannot cite a single authority that grants such an exception, which is unsurprising because the result is foreclosed by cases like *Morlife* and *MAI Systems*.  Nor do Defendants explain why *solicitation* is necessary if the business already exists, let alone why *Defendants* must be the ones to do the solicitation.  If the employers already have this business, the injunction does not preclude them (but not Defendants, of course) from maintaining it.

**4.**  On the fourth point, Defendants suggest that they be allowed to solicit ExamWorks' customers and physicians for "non-competing business."  Contrary to Defendants' argument that IPM does not compete with ExamWorks, Defendants concede that at least *some* of IPM's business is competitive.  ECF No. 26-2 (Girard Decl.) ¶ 5 (declaring that 97%, but not all, of IPM's business is litigation-related treatment); ECF No. 26-5 (Baldini Decl.) ¶ 4 (same).  Further, the plan all along was to "[u]se existing Entity" like "IPM" to launch Baldini and Girard's unlawful venture, which *is* directly competitive with ExamWorks.  ECF No. 21-2 (Holley Decl.) Ex. E at 3.  If Defendants are given permission to subjectively determine what is and is not competitive and to launch their unlawful venture on that basis, it will be the equivalent of carte blanche to misappropriate and harm ExamWorks.  Girard and Baldini selected IPM because of its portfolio of "med-legal" work that could be "[i]mmediately onboard[ed]."  *Id.* at 4.  IPM's website has a section dedicated to medical legal evaluations.  Supp. Lui Decl. Ex. M; Supp. Nalley Decl. ¶ 4.  Dunamis offers similar services, including "Agreed Medical Examinations," "Panel Qualified Medical Examinations," and related services that compete with ExamWorks.  Supp. Lui Decl. Ex. N.; Supp. Nalley Decl. ¶ 5.  Tejada

"leads the SIBTF department" at Dunamis and has already "been key in developing and marketing the SIBTF program." ECF No. 21-2 (Lui Decl.) Ex. A at 3–5. Moreover, as an account executive, she is clearly client-facing. Given the central role of Tejada, SIBTF trade secrets, *and* Dunamis' President James Tuthill, the weight of evidence shows that enjoining Tejada is necessary. *See, e.g.*, ECF No. 21-2 (Holley Decl.) Ex. E at 3 (citing James Tuthill as part of the "Money Discussion"), Ex. O at 3 (presenting Defendants' unlawful business plan to James Tuthill).

Defendants cannot cite a single case to support these arguments because no authority exists—a departing employee cannot steal trade secrets and compete against a former employer.

## VI. DEFENDANTS MUST BEAR THE COST OF RESPONDING TO DISCOVERY.

Defendants misappropriated ExamWorks' trade secrets and intended to make a lot of money from their misdeeds at ExamWorks' expense. *E.g.*, ECF No. 21-2 (Holley Decl.) Ex. E at 3 (describing initial payments to Girard and Baldini of $28,000/month). Now that they have been caught, they play the pauper and seek to shift even more of the cost of their unlawful activity to ExamWorks. The Court should not countenance this ploy and Defendants should bear the costs of responding to discovery as is the normal course of action under the Federal Rules. *E.g.*, *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358 (1978) ("the presumption is that the responding party must bear the expense of complying with discovery requests"). A forensic protocol is routine in trade secrets cases, and once misappropriation is established it is common for the defendants to pay for costs associated with finding and scrubbing the stolen information. *See Canon Sols. Am., Inc. v. Gungap*, SACV 14-1990-JLS (RNBx), 2015 WL 13388254, at *2 (C.D. Cal. Sept. 9, 2015) (ordering trade secret defendant to bear the cost of forensic inspection in the event stolen information is found). Since Defendants concede misappropriation, they should bear the cost of finding the stolen information and returning it to ExamWorks—and they should have plenty of personal or investor funds to do so. *See* ECF No. 21-2 (Holley Decl.) Ex. E (discussing "Capitol [sic] investment" from Tuthill, George, and Feinberg).

## VII. TEJADA CONCEDES SHE PARTICIPATED IN THE UNLAWFUL SCHEME.

Tejada, like Bird, violated ExamWorks' policy by emailing confidential trade secret information to an unauthorized personal account. ECF No. 4-6 (Statham Decl.) Ex. A at 2.

Moreover, Tejada concedes that Defendants Girard and Baldini involved her in their unlawful scheme in mid-January 2020, facilitated her transition to a company run by their investor James Tuthill, and she willingly signed on to the scheme. ECF No. 26-4 (Tejada Decl.) ¶¶ 2–4. ExamWorks is likely to succeed on the merits of its claim against Tejada. Tejada also fails to address the remaining preliminary injunction factors, all of which favor an injunction, and fails to explain how she would be burdened in any cognizable way by the relief requested in this motion. In any event, Dunamis *does* compete with ExamWorks in SIBTF and medical legal examinations, Tejada *leads* Dunamis' SIBTF department, and Defendants have already undercut ExamWorks' SIBTF business in the course of the misappropriation. *See* Supp. Lui Decl. Ex. M.

## VIII. DEFENDANT BIRD MISAPPROPRIATED THOUSANDS OF RECORDS.

Defendant Bird singlehandedly and via a single email misappropriated over 100,000 client and physician records by emailing them to an unauthorized personal email address, which was against express company policy. She does not dispute this and thus concedes that ExamWorks is likely to succeed on the merits of its misappropriation claim against her. *E.g., Allergan, Inc. v. Merz Pharm., LLC,* No. SACV 11–446 AG (Ex), 2012 WL 781705, at *11–12 (C.D. Cal. Mar. 9, 2012) (holding that employees misappropriated trade secrets by emailing them to personal accounts); *Ajaxo Inc. v. E\*Trade Grp., Inc.*, 135 Cal. App. 4th 21, 66 (2005) (misappropriation includes "disclos[ure] … in violation of a nondisclosure obligation" with no subjective intent requirement). Nor does Bird explain how she *acquired* the documents (which is itself a misappropriation) given that she had no authorized access and no business reason to possess them. *See* ECF No. 4-5 (Nalley Decl.) ¶ 28. Bird concedes by not addressing the remaining preliminary injunction factors such as irreparable harm to ExamWorks and the public interest in an injunction to protect trade secrets. Given the claim that she has no plans to compete, an injunction preventing her from misusing ExamWorks' trade secrets places no burden on her.

## IX. CONCLUSION

It is no one's fault other than Defendants that they were caught stealing trade secrets red-handed. The requested injunction is necessary and tailored to Defendants' conceded misconduct. The Court should make the temporary restraining order permanent pending trial.

| | |
|---|---|
| 1  Dated: May 18, 2020 | ORRICK, HERRINGTON & SUTCLIFFE LLP |

By: _/s/ Robert S. Shwarts_
ROBERT S. SHWARTS
Attorneys for Plaintiff
ExamWorks, LLC