ROBERT S. SHWARTS (STATE BAR NO. 196803)
rshwarts@orrick.com
CATHERINE Y. LUI (STATE BAR NO. 239648)
clui@orrick.com
NATHAN SHAFFER (STATE BAR NO. 282015)
nshaffer@orrick.com
JOHANNA JACOB (STATE BAR NO. 286796)
jjacob@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

Attorneys for Plaintiff
ExamWorks, LLC

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| EXAMWORKS, LLC, a Delaware limited liability company,<br><br>            Plaintiff,<br><br>    v.<br><br>TODD BALDINI, an individual, ABYGAIL BIRD, an individual, LAWRENCE STUART GIRARD, an individual, PAMELLA TEJADA, an individual, ROE CORPORATION, and DOES 1 through 10,<br><br>            Defendants. | Case No. 2:20-CV-00920-KJM-DB<br><br>**EXAMWORKS' SUPPLEMENTAL BRIEF IN SUPPORT OF A PRELIMINARY INJUNCTION**<br><br>Date:          June 3, 2020 (Tentative)<br>Time:         10:00 a.m.<br>Courtroom:  3, 15th Floor<br>Judge:        Hon. Kimberly J. Mueller |

The misappropriation committed by Defendants L. Stuart Girard, Todd Baldini, Pamella Tejada, and Abygail Bird is worse than ExamWorks could have imagined.

Expedited discovery started last week with the depositions of Girard, Baldini, and Tejada, which took place before documents were produced.  Limited documents were produced through the forensic protocol only on Saturday May 23, 2020, and the forensic analysis on Defendants' accounts and devices remains outstanding at the time of drafting.[1]  But even initial limited discovery uncovered a mountain of evidence showing that Defendants not only stole ExamWorks' trade secrets (which they concede), but they did it in order to build a business using ExamWorks' models, forms, clients, and doctors—in other words, they copied ExamWorks' business from top to bottom including ExamWorks' closely guarded trade secrets.  Moreover, the limited evidence that ExamWorks has received further demonstrates that the Defendants have repeatedly and willfully committed perjury, both through declarations submitted to the Court and at their depositions.

As previously described, Baldini and Girard, the co-executives in charge of ExamWorks' California operation, hatched a plan two years ago to steal ExamWorks' trade secrets in order to launch a directly competitive business in the independent medical evaluation ("IME" or "med-legal") field.  *E.g.*, ECF No. 4-1 (MPA ISO TRO) at 6; ECF No. 27 (Reply ISO TRO) at 1.  Discovery shows that Defendants' dream (and ExamWorks' nightmare) is now a reality—dubbed "IPM Medical Legal" or "IPM Med Legal," Baldini and Girard along with co-defendant Tejada, Doctor Steven Feinberg, James Tuthill (also head of Dunamis Alliance), and investor Bill George (also head of IPM) built out their operation and are now competing against ExamWorks using the stolen information.  Defendants solicited ExamWorks' customers using ExamWorks' trade secrets and succeeded in obtaining new business.  On March 19, 2020, Girard emailed Dr. Feinberg and Tejada from his IPM email account, telling them: "Lots to do.  This is the spreadsheet we used to blast our message yesterday."  The spreadsheet referenced was a version of the ExamWorks' "Clients.xlsx" spreadsheet, which Bird forwarded to Girard's personal email account on December 2, 2019, and contained over 150,000 entries of ExamWorks' nationwide clients.  For his part, understanding the impact of solicitation, Girard declared he had "not used any ExamWorks

---

[1] The analysis is delayed due to Defendants' meritless stalling.  Suppl. Lui Decl. ¶ 3, Ex. 39.

- 1 -

EXAMWORKS' SUPP. BR. ISO PRELIM. INJUNCTION

documents since I left to compete with it or to take any opportunities from it." That is one of many lies Defendants have told the Court. Suppl. Lui Decl. Ex. 1; Suppl. Nalley Decl. ¶ 5.

Given the record *before* expedited discovery revealed the depth of the misconduct, the Court was inclined to make the existent temporary restraining order permanent pending trial on the merits. *See* ECF No. 37 (Minute Ord.). Defendants have already conceded "if any solicitations of trade secrets clients have occurred, … the injunction would be expanded to include those people." 5/29/2020 Hr'g Tr. at 24:2–5. Given unequivocal evidence of solicitation using a stolen list containing *all* ExamWorks clients, Defendants effectively concede that the scope of the injunction in place now is appropriate and it should be extended until trial.

## I.  **DEFENDANTS IMPLEMENTED PROJECT PALO ALTO AS "IPM MED LEGAL"**

Baldini drafted a comprehensive business plan for what would be IPM Med Legal as early as October 2018. Lui Decl. Ex. 36 (Baldini Dep.) 37:13–38 (discussing ECF No. 21-2 (Holley Decl. Ex. O). Over the following 18 months, Baldini and Girard managed to recruit business partners Feinberg, Tuthill, and George to join the scheme. In December 2019, they were ready to implement the plan. On December 2, 2019, Baldini circulated a draft equity agreement prepared by Bill George to Girard. Lui Decl. Ex. 2. December 2, 2019, was the same day that Bird, acting at Girard's request, misappropriated massive ExamWorks' nationwide client and doctor lists. ECF No. 26-2 (Holley Decl.) Ex. J. By February 6, all participants—Girard, Tuthill, Feinberg, and Baldini—were on board and returned signed equity agreements. Lui Decl. Ex. 3. At this point, Girard and Baldini both still worked at ExamWorks.

During the first few months of 2020, Defendants did everything required to launch their unlawful venture. They met multiple times, prepared budgets and business plans, and discussed potential acquisitions and "assimilation" of the group "into the IPM organization." *E.g.*, Lui Decl. Exs. 4–6. They sought to lease office space adjacent to IPM's existing offices. Lui Decl. Exs. 7–8. At the same time, Baldini, Girard, Feinberg, Tuthill, and George took steps to hire Tejada to bring her expertise with the Subsequent Injury Benefit Trust Fund ("SIBTF") to IPM Med Legal. Lui Decl. Ex. 9. Both Tuthill and Feinberg met with Tejada and were "very impressed," and Tejada herself was "essentially all in" on the scheme. *Id.*

With everything necessary to launch their new business in place, Defendants got to work. As detailed in the next sections, that work included taking ExamWorks' stolen trade secrets and using them to at least 1) directly solicit clients using ExamWork's entire client list; 2) build and replicate ExamWorks' database in a new database for use by IPM Med Legal to recruit doctors and clients; and 3) poach significant business from at least one important ExamWorks client.

## II.     DEFENDANTS STOLE AND THEN USED EXAMWORKS TRADE SECRETS

**Building IPM Med Legal's Database**.  In order to build IPM Med Legal into a competitive force, Defendants knew that they would have to recruit—both clients (referring/applicant attorneys) and doctors.  As Girard put it, "to have a medical-legal company, you would need doctors," which meant "recruit[ing] doctors that work for … ExamWorks." Lui Ex. 37 (Girard Dep.) at 55:4–56:3, 65:21–66:24; Lui Ex. 36 (Baldini Dep.) at 41:4–14 (describing importance of physicians and applicant attorneys to a med-legal business); *see also* ECF No. 4-5 (Nalley Decl.) ¶ 12 (describing importance of doctors).  To do that, Defendants needed a database of attorneys and doctors.

Girard began working on taking information from ExamWorks' databases as early as December 2017, when he asked another ExamWorks employee for "access to our doctor data base" and "a tutorial." Lui Decl. Ex. 10.  In February 2018, he lifted ***150,000 entries*** for ExamWorks' clients and doctors and dumped them into his personal email account.  Lui Decl. Ex. 11; Suppl. Nalley Decl. ¶ 5.  In August 2019, Bird sent emails with large amounts of ExamWorks data first to her personal account and then to Girard's personal account, including confidential recruiting materials and acquisition due diligence for a target IPM Med Legal considered.  Lui Decl. Ex. 32; Nalley Decl. ¶ 6.  In December 2019, just as he was planning the final details for launch of IPM Med legal, Girard asked Bird to send him two updated lists of doctors and clients (the attachments are named "doctors.xlsx" and "Clients.xlsx") that reflected updated information for tens of thousands of entries from ExamWorks' database.  ECF No. 26-2 (Girard Decl.) ¶ 3; ECF No. 4-5 (Nalley Decl.) ¶ 28 (describing nature of lists).  Girard did not engage in this misconduct alone. The stolen information was put to use.

IPM Med Legal's first major project was to assemble a unified database of client and doctor contact information (similar to ExamWorks' IMECentric databases) so they could get to work

recruiting for their new venture; the effort on the "database for IPM" was led by Tejada. Lui. Decl. Ex. 13. In order to build the database, Girard sent Tejada both at least an iteration of the stolen Clients.xlsx file he requested from Bird. Lui Decl. Ex. 1 (forwarding files to Tejada). The doctors.xlsx list Girard stole went to Feinberg, who was working with Tejada on the database. Lui Decl. Ex. 37 (Girard Dep.) at 99:9–17; *see* Lui Decl. Ex. 15. Tejada "spent hours, weeks" on the database project, combining multiple lists provided by Girard and Baldini. Lui Decl. Ex. 38 (Tejada Dep.) 55:7–11. Baldini continued to participate even though he was still employed by ExamWorks at the time, helping to "clean[] up" a list of "Referral Sources" being developed by Girard for use with IPM. Lui Decl. Ex. 16. Baldini also provided feedback on the developing physician recruiting list by nixing those that were exclusive to ExamWorks (information he was privy to as an employee). Lui Decl. Ex. 17. Whatever IPM Med Legal needed from ExamWorks, Baldini could get. *See, e.g.*, Lui Decl. Ex. 28 (forwarding nonpublic draft ExamWorks forms to Tejada).

**Defendants Used the Stolen Information to Solicit Business**. Even before the IPM Med Legal database was complete, Girard used a version of the Clients.xlsx file he stole from ExamWorks to "blast out our message" on March 19, 2020. Lui Decl. Ex. A. Once the database was complete, it did not sit idle, either. Tejada provided it to Tuthill and his shell company Dunamis as well as Baldini and Girard for use with IPM Med Legal. Lui Ex. 38 (Tejada Dep.) at 54:10–19, 59:10–19. Girard passed the database onto IPM so that it could be used as a "resource" for IPM's marketing purposes. Lui Decl. Ex. 37 (Girard Dep.) at 107:4–20. As Tejada explained, the purpose of the database was to "let people know about" Girard and Baldini's venture and they needed "one list that they could use for whatever they needed to do." Lui Decl. Ex. 38 (Tejada Dep.) at 53:4–20. For her part, there is plenty of evidence that Tejada was using ExamWorks' client contact information to solicit business from ExamWorks' customers. Lui Decl. Ex. 18.

**Defendants Successfully Poached a Key ExamWorks SIBTF Client**. As set forth in the initial Nalley Declaration (ECF No. 4-5), ExamWorks noted a steep drop off in referrals from three law firms that refer a substantial number of SIBTF cases to ExamWorks. Expedited discovery has shown that for at least one of those firms, the drop off is due to Defendants' unlawful venture. Suppl. Nalley Decl. ¶ 4. On April 1, 2020, the firm contacted Girard to let him know they had "at

1  least 100 SIBTF apps that we are going to file in the next 30 days." Lui Decl. Ex. 19.  Girard was
2  meeting with representatives from the firm to go over their SIBTF business in 2020 around the
3  same time.  Lui Decl. Ex. 20.   By May 1, 2020—just days before this suit was filed—IPM Med
4  Legal was expecting its first tranche of cases "within the next week."  Lui Decl. Ex. 21.  The loss
5  in business to ExamWorks is substantial.  ExamWorks would normally expect to see nearly 60
6  applications from *three* law firms in a month.  Suppl. Nalley Decl. ¶ 4.  One hundred cases represent
7  a collective hundreds of thousands in lost revenue—not to mention the loss of unknown levels of
8  future business.  Suppl. Nalley Decl. ¶ 4.

## III. DEFENDANTS DESPERATELY SOUGHT TO COVER-UP THEIR WRONGDOING

That Defendants understood that their conduct was unlawful is beyond dispute given the great lengths they have gone to in order to conceal their wrongdoing, first from ExamWorks and now from this Court.  From day one, Defendants plotted how to conceal their unlawful scheme from ExamWorks by concocting various cover stories to explain their departures and conceal their theft of trade secrets.  *See, e.g.*, ECF No. 4-1 (MPA ISO TRO & PI) at 6–7 (collecting evidence of Defendants' efforts to conceal their plot).  Defendants have since doubled down by submitting false and misleading declarations, giving evasive deposition testimony, and seeking to obfuscate the nature of their venture in order to limit the scope of the preliminary injunction.  Now that these efforts are shown to be a cheap form of legerdemain, it is clear that Defendants cannot be trusted with ExamWorks' trade secrets and confidential information and must be enjoined pending trial.

**Defendants Schemed Together As a Business Venture to Cover Their Tracks**.  In February 2020, Baldini sent a summary document of the plan.  Lui Decl. Ex. 22.  Girard was to resign from ExamWorks on March 2, 2020 and give a false reason for his departure ("New opportunity as an M&A and Branding specialist for a treating practice).  But he was actually supposed to start at IPM Med Legal with the new offices "available on 05/01/2020."  *Id.*  It was key to "get Pamella [Tejada] out of E[xam]W[orks] prior to Stuart leaving" to keep suspicions low, so she would give notice before Girard.  Baldini was to give notice on March 23, 2020, and it was still up in the air if he would say he was going to IPM or taking a job with Feinberg's practice.  *Id.*

As Baldini explained to Feinberg a few days prior, it might be necessary for Baldini to conceal that he was joining IPM if ExamWorks began to suspect the unlawful scheme, and if that were the case Baldini would "work[] for [Feinberg]" and "sell[] my services to IPM" to hide his actual role with IPM Med Legal because "we need to be careful." Lui Decl. Ex. 23.  It was not only Baldini who understood the need for secrecy.  When Baldini jumped in to provide feedback on Tejada and Feinberg's work product, he was scolded by IPM-head Bill George that he "should NOT be on these emails threads … and certainly should not be calling meetings or making to do lists … not while you are employed elsewhere," and he should "[p]lease … go dark." Lui Decl. Ex. 24.  Although no one expected Baldini to actually stop participating in the scheme—it was sufficient to "limit to telephone only comm[unication]" in order to evade detection.  *Id.*

When these efforts at secrecy were insufficient and Defendants were caught red-handed stealing ExamWorks' trade secrets, this lawsuit was filed.  As George put it, "[t]he issue is more clear to me that [Defendants] have been leaving a trail for a long time … that I did not expect … and that is not good." Lui Decl. Ex. 25.  George also put forward what would become Defendants' specious defense:  "there is no company … no nuco [new company]" so they could deny that the scheme was ever pursued and that there was no venture despite the overwhelming evidence to the contrary.  Despite having launched IPM Med Legal, recruited clients and doctors using ExamWorks' trade secrets, and even leased office space, each Defendant claimed in sworn testimony and materials submitted to this Court that no such venture existed or gave other unsupported and non-cognizable reasons the Court should limit the scope of injunctive relief.  As detailed below, Defendants have repeatedly lied under oath.

**Girard**.  Girard seeks to evade the full scope of injunctive relief through selective omissions and misrepresentations.  Girard declares, for example, that he and Baldini "had imagined forming a new corporation after we left, but we have not taken any steps to do so." ECF No. 26-2 (Girard Decl.) ¶ 2. Girard also claims, under oath, that he has "not used any ExamWorks documents since I left to compete with it or take any opportunities from it." *Id.* False, given the evidence that (1) Girard formed a new company, IPM Med Legal, as a principal with formal equity sharing agreement, (2) used ExamWorks' Clients 2019.xlsx list to "blast out our message yesterday" (on

- 6 -

March 19, 2020), and (3) was actively recruiting ExamWorks' doctors. Lui Decl. Exs. 1, 26. Girard went so far in his declaration and deposition to deny 1) that IPM competed in the med-legal business (it does) and 2) that Girard was involved in a competitive business with IPM at all—testimony that we now know is false, incomplete, and misleading. ECF No. 26-2 (Girard Decl.) ¶ 5 (testifying the IPM's business is "treating a patient" in "contrast" to ExamWorks); Lui Decl. Ex. 37 (Girard Dep.) at 98:23–100:8. Not to mention the mountain of evidence showing that pilfered information was used to construct IPM Med Legal's database. Similarly, Girard declared that he had strong relationships in the medical-legal field from before his work at ExamWorks, but at deposition he testified that his job with ExamWorks, through a predecessor-in-interest acquired by ExamWorks, was his first professional position in the field and he had no prior relevant experience. *Compare* ECF No. 26-2 (Girard Decl.) ¶ 4 *with* Lui Decl. Ex. 37 (Girard Dep.) at 11:7–25.

**Baldini**. Baldini took the same approach as Girard, giving the same false written testimony that they had not taken steps to form their competing company. ECF No. 26-5 (Baldini Decl.) ¶ 2. Baldini also claims significant experience in the field such that an injunction would be over broad. *Id.* ¶ 3. He, too, has no such relevant experience because his last job before joining ExamWorks was as a chiropractor. Lui Decl. Ex. 36 (Baldini Dep.) at 8:11–25. Like Girard, Baldini testified at his deposition that he had no involvement in IPM's med-legal business. *Id.* at 16:22–17:19. But he did—not only was his primary role to stand up IPM Med Legal as a new venture, but his formal offer letter from IPM stated that his job was "Director Medical-Legal Operations." Lui Decl. Ex. 27. Baldini's declaration, like Girard's, denies that he used ExamWorks' information "since I left to compete with" ExamWorks, but he selectively omits the documents he provided to Tejada *while employed at ExamWorks* for use with IPM Med Legal, not to mention ongoing support he provided to the venture. *E.g.*, Lui Decl. Ex. 28. At his deposition, Baldini further denied that he was in a venture with Feinberg and that the med-legal startup was abandoned with no concrete steps taken to form the company so early that no agreement was reached on equity shares. Lui Decl. Ex. 36 (Baldini Dep.) at 60:16–61:1, 61:14–62:5, 62:6–9, 68:3–6. Baldini also, incredibly, denied that the plan was to form IPM Med Legal. *Id.* at 70:14–19.

If this was not enough, Baldini admitted that he *deleted* relevant material *after* he received

notice of the lawsuit, which informed him to preserve all documents related to the Complaint. Lui Decl. Ex. 36 (Baldini Dep.) at 85:2–87:19, 88:17–89:7; ECF No. 21-1 (Lui Decl.) Ex. C. ExamWorks is not yet able to determine the extent of his spoliation, one thing is clear: Baldini deleted files to cover up his misconduct.

**Tejada**. Tejada is a central figure in the IPM Med Legal scheme. In her declaration, Tejada denies using ExamWorks documents and omits her role in IPM Med Legal and generally describes a completely different role as a medical records specialist at Dunamis. ECF No. 26-4 (Tejada Decl.) ¶¶ 5–6. At her deposition, Tejada generally testified that she was unaware of the joint venture before she left ExamWorks for a new job at Dunamis. Lui Decl. Ex. 38 (Tejada Dep.) 38:11–39:6. The documents produced in discovery show that this information is false. Tejada was fully briefed on IPM Med Legal when she decided to leave ExamWorks and was "essentially all in." Lui Decl. Ex. 9. She also knew that the Dunamis job was a sham and it was only to last three months. Lui Decl. Ex. 29. Tejada knew that primary job would be to support IPM Med Legal—not Dunamis— and pointed out that the proposed Dunamis employment agreement had a provision that conflicted with that role (ironically, a provision regarding protection of trade secrets). Lui Decl. Ex. 30. Throughout the project, Tejada understood the need for secrecy and colluded with Girard to "scrub the emails to make sure that we d[o] not have MES, E[xam]W[orks]" in the database she was working on. Lui Decl. Ex. 31. Not only that, despite being enjoined from doing so by the Court's TRO on May 8, 2020 (ECF No. 17), Tejada continues to do business with ExamWorks' clients that were misappropriated. Lui Decl. Ex. 38 (Tejada Dep.) at 87:18–24.

**Bird**. There remain serious questions about Bird's role in IPM Med Legal and what ExamWorks trade secrets Bird continues to have in her possession. ExamWorks has uncovered emails where Bird sent substantial sensitive trade secret ExamWorks documents to her personal Gmail account and then forwarded them to Girard's personal email account. *E.g.*, Suppl. Nalley Decl. ¶ 6. Despite using her Gmail account to forward herself ExamWorks trade secrets, Bird did not produce her Gmail account for inspection as required by the TRO. ExamWorks has no idea what these materials were used for (although circumstances suggest use with the unlawful scheme) and what materials Bird still has. Lui Decl. Ex. 33. Until Bird is forthcoming, she must be enjoined.

## IV. ARGUMENT

### A. Discovery Shows That the Injunction's Scope Is Tailored to the Misconduct.

Defendants do not contest that they stole ExamWorks' trade secrets and that an injunction is necessary. ECF No. 26 (Opp. to PI) at 1. Defendants contest the *scope*, but each basis offered to limit scope is shown by the last 10 days of expedited discovery to be unsubstantiated or false.

**1. Defendants' Unlawful Business Can Be Enjoined**. As set forth in ExamWorks' reply and as found by the Court, the law supports enjoining Defendants from doing business with those clients and doctors that are included in the misappropriated trade secrets. ECF No. 27 (Reply ISO PI) at 4–6; *see also* ECF No. 37 (Minute Order) (finding, "The record does not dispel the reasonable inference that defendants, given the roles they played while still employed by plaintiff, cannot conduct business with any entity identified on the curated list without using or disclosing plaintiff's trade secrets as fully identified in the complaint and in the briefing"). Moreover, Defendants' argument as to scope concedes that a preliminary injunction may properly "stop defendants from doing business only with those customers they have already solicited." ECF No. 26 (Opp. to PI) at 1. Although this argument is wrong on the law, given evidence that Defendants used the misappropriated Clients 2019.xlsx list, which includes *all* ExamWorks' clients, to "blast out our message," Lui Decl. Ex. 1, and evidence summarized above showing that the stolen trade secrets have been ingested into IPM's systems for use in marketing and solicitation, Defendants concede that the scope of the existing TRO is proper and should be made permanent pending trial.

**2. Defendants Lack Independent Industry Connections**. Defendants also argue that they should be allowed to use their "extensive background and vast experience in the medical-legal world with substantial relationships with doctors, lawyers, and insurance carriers" despite their misappropriation. ECF No. 26 (Opp. to PI) at 15–16. The problem is that they do not have any such preexisting connections—Baldini and Girard testified that their first experience was with ExamWorks (through predecessor companies ExamWorks bought). Lui Decl. Ex. 37 (Girard Dep.) at 11:7–25; Lui Decl. Ex. 36 (Baldini Dep.) at 8:11–25. With no relevant experience or connections outside of ExamWorks' trade secrets, this is not a basis to narrow the scope of the injunction.

**3. Defendants Cannot Use Their Sham Employers to Evade the Injunction**. Finally,

- 9 -

EXAMWORKS' SUPP. BR. ISO
PRELIM. INJUNCTION

Defendants suggest that they should be able to do business with clients and doctors identified in the misappropriated trade secrets through the unsupported claim that their employers had preexisting relationships with an as-yet-unidentified subset of the misappropriated entities. ECF No. 26 (Opp. to PI) at 17. Again, evidence from expedited discovery shows that this is not a basis to narrow the injunction. Tejada, for instance, was working for Dunamis only as a sham to hide her role with IPM Med Legal. Similarly, Girard and Baldini were brought onto IPM's books as a way to falsely claim that they were working only on the treatment side of the business—a claim that is directly contrary to the substantial evidence that they are operating a med-legal start-up. Further, both Dunamis and IPM ingested the IPM Med Legal database that was created from ExamWorks' trade secrets, and Defendants offer no explanation as to how they can participate in *any* business with their new employers *without* using ExamWorks' trade secrets.

### B. Defendants Should Bear the Burden of Forensic Analysis.

Discovery also shows that Defendants should bear the costs associated with forensic analysis necessary to remedy their misdeeds. First, the claim that Defendants lack financial resources necessary to cover the costs of a forensic neutral are contradicted by the record establishing that they are part of an investor-backed venture. Defendants Girard, Baldini, and Tejada are being compensated with guaranteed salaries in the six figures (excluding any equity stake). Lui Decl. Exs. 36 (Baldini Dep.) 34:4–12; 34 (Girard Offer Letter); 35 (Tejada Offer Letter). Second, Defendants have not rebutted the presumption that they should bear the cost of responding to electronic discovery requests. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358 (1978) ("the presumption is that the responding party must bear the expense of complying with discovery requests"). Third, evidence of trade secret theft coupled with spoliation after Defendants received notice of this litigation is a sufficient basis for them to bear the costs associated with their misconduct. *See Blumenthal Distrib., Inc. v. Herman Miller, Inc.*, 14-cv-1926, 2016 WL 6609208, at *27 (C.D. Cal. July 12, 2016) (awarding sanctions in the form of cost-shifting, including the expense of forensic analysis, for spoliation that was the result of, at a minimum, gross negligence).

### V. CONCLUSION

For the foregoing reasons, ExamWorks requests that Defendants be enjoined pending trial.

Dated: May 29, 2020

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: */s/ Robert S. Shwarts*
ROBERT S. SHWARTS
Attorneys for Plaintiff
ExamWorks, LLC