1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT

9         FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   EXAMWORKS, a Delaware limited          No. 2:20-CV-00920-KJM-DB
     liability company,
12
                 Plaintiff,
13                                          ORDER
           v.
14
     TODD BALDINI, et al.,
15
                 Defendants.
16

17

18          Plaintiff ExamWorks, LLC has sued its former employees, L. Stuart Girard, Todd

19   Baldini, Pamella Tejada and Abygail Bird (collectively "defendants"), alleging misappropriation

20   of its trade secrets.  ExamWorks moves for a preliminary injunction barring defendants'

21   continued misappropriation of those trade secrets.  The court, having considered the arguments of

22   counsel on May 22, 2020, and June 3, 2020, and the parties' briefs including supplemental

23   briefing, HAS GRANTED plaintiff's motion, for the reasons EXPLAINED below.[1]

24

25

26   ─────────────────
         [1] This order provides the court's explanation for the summary order entered previously on
27   June 3, 2020.  See ECF No. 45. The court notes defendants have filed a motion to stay the
     preliminary injunction order, ECF No. 49, which the court will turn to next.
28

                                                1

1    I.        BACKGROUND

2             A.        Factual Background and Allegations

3                       ExamWorks is an independent firm that operates in what it dubs a "med-legal"

4    space by managing medical examinations, peer reviews, bill reviews, Medicare compliance and

5    related services for clients including insurance carriers, third party claim administrators and

6    government agencies throughout the United States.  Nalley Decl. ¶ 3, ECF No. 4-5.  Through its

7    network of medical professionals, ExamWorks offers medical evaluation services, including

8    Independent Medical Examinations ("IMEs"), Qualified Medical Evaluations ("QMEs") and

9    California Subsequent Injury Benefit Trust Fund ("SIBTF") evaluations for workers'

10   compensation claims, personal injury, and auto and disability claims.  Id. ¶¶ 3, 16.

11                      1.        Former Employees' Departure from ExamWorks

12                      Between February 24 and May 4, 2020, plaintiff's former employees, Lawrence

13   Stuart Girard, Todd Baldini, Pamella Tejada and Abygail Bird (together the "Former

14   Employees") either resigned or, once ExamWorks got wind of the Former Employees' plans,

15   were terminated from ExamWorks. Compl. ¶¶ 41–45, ECF No. 1.  Specifically, Tejada resigned

16   on February 24, 2020 and left on March 13, 2020; Girard left on March 13, 2020; ExamWorks

17   terminated Baldini on April 29, 2020 and terminated Bird on May 4, 2020.  Id.

18                      Girard had served as Vice President of Sales and Marketing and worked for

19   ExamWorks for more than a decade.  Id. ¶ 20.  Baldini was the Regional Vice President of

20   Operations in California and worked for ExamWorks for over nine years.  Id. ¶ 21.  Together,

21   Girard and Baldini led ExamWorks' California operation.  Id. ¶ 22.  Baldini more broadly

22   supervised ExamWorks' business in the Western regions, including California and Hawaii.  Id.

23   ¶ 33.  Due to their management roles, Girard and Baldini had full access to ExamWorks'

24   financials and other trade secret and confidential information.  Id. ¶ 22.

25                      Tejada was the SIBTF Division Manager in Sacramento, California and had

26   worked at ExamWorks for nearly four years.  Id. ¶ 23.  Tejada's duties included meeting with

27   clients and perspective clients, assigning new cases to physicians, educating physicians on

28

2

1    reporting requirements and management of the internal operational team.  *Id.*  Tejada had access

2    to all data associated with ExamWorks' California operations and SIBTF work.  *Id.*

3            Bird worked for ExamWorks for more than seven years as a marketing director

4    until she was promoted to Regional Account Executive for California.  *Id.* ¶ 24.  In her various

5    roles, Bird was responsible for marketing, doctor referrals, raising ExamWorks' profile and,

6    generally, bringing in business for ExamWorks.  *Id.*  Both Bird and Tejada worked closely with

7    Girard and Baldini.  *Id.*

8                    2.        "Project Palo Alto"

9            Following the Former Employees' departure, ExamWorks discovered that,

10   beginning in October 2018, the Former Employees had begun development of a comprehensive

11   business plan dubbed "Project Palo Alto," as reflected in multiple emails and planning

12   documents.  TRO Mot., ECF No. 4, at 11[2] (citing Holley Decl. ¶¶ 8, 10, ECF No. 28-1).  In a

13   document dated April 8, 2019, Former Employees identified the need to plan "the best way to

14   depart ExamWorks without raising suspicion. Was it best to go 'One at a time vs. together'?

15   What would the explanation be for their departures?"  Holley Decl., Ex. E ("Meeting Outline"),

16   ECF No. 21-2, at 18–19 ("If separate, who first, when, how and why? . . . if Second who second

17   when, how and why?").

18           Through expedited discovery after the court issued a temporary restraining order,

19   ExamWorks learned the "Project Palo Alto" business plan outlined creation of a company called

20   "Feinberg Med-Legal Consultants," which would compete directly with ExamWorks' emerging

21   SIBTF business and expand initially by "targeting two specific demographics: 1. Physician

22   recruiting and 2. Applicant Attorney[3] Firms."  Holley Decl., Ex. O ("Feinberg Med-Legal

23   Consultants Plan Overview"), ECF No. 21-2, at 27.  The new company would be co-owned by

24   Girard, ExamWorks vendor James Tuthill and former ExamWorks medical provider Dr. Steven

25   _____

            [2] The court cites to the page numbers assigned by the court's ECF system.

26
            [3] Applicant or applicants' attorneys represent injured workers filing for workers'
27   compensation.  *See, e.g.,* https://wwwcaaa.org/ (website for California Applicants' Attorneys
     Association).

28

1    Feinberg.  *Id*.  William George would be an equity partner as well and serve as CFO.  *Id.* at 19.

2    The plan also included a 24-month budget for the new company.  Harris Decl. ¶ 18, ECF No. 21

3    ("Among the files Girard attempted to delete while the USB drive was attached were "Project

4    Palo Alto Construction meeting 4-8-19.docx" and "FML Budget Draft-24 month 7-3-19 Run Rate

5    Analysis Final.xlsx"); Holley Decl., Ex. Q ("Draft Budget"), ECF No. 21-2, at 31 (attachment to

6    email showing link to document titled draft budget for Project Palo Alto).

7                          3.      ExamWorks' Forensic Investigation

8                 Before filing the instant motion, ExamWorks engaged a forensic firm, K2

9    Intelligence and its partner forensics and e-discovery provider KLDiscovery (collectively "K2"),

10   "in order to investigate the defendant's [sic] actions related to this lawsuit."  Nalley, Decl. ¶ 27

11   (citing Holley Decl. ¶ 8, ECF No. 21-2).  K2's analysis revealed Former Employees took

12   ExamWorks' documents and information with them when they left the company, including

13   (1) detailed contact information about doctors and clients, and company-wide customer and

14   doctor lists; (2) financial information about plaintiff's California operations; (3) a California sales

15   and operational presentation; and (4) specific arrangements regarding the compensation plaintiff

16   offers to certain doctors, Nalley Decl. ¶ 27; defendants emailed this information to their personal

17   email accounts or to third parties, Harris Decl. ¶ 13, ECF No. 21.  As recently as March 22, 2020,

18   just over a week after Girard and Tejada left ExamWorks and about a month before Baldini was

19   terminated, it appears Baldini sent the file titled "Cases-01-2019 to 03-202.xlsx," an ExamWorks

20   document containing information on more than 53,000 cases from the last year and a half with

21   detailed contact information for both doctors and customers, from his ExamWorks email to his

22   personal email address.  *Id*. ¶ 29.

23                 The K2 forensic analysis also revealed that, as early as March 3, 2019, Girard sent

24   documents titled "Brice B Fee Schedule 022719.PDF," "Proposal- Brice 022719.PDF," "Brice B

25   Fee Schedule Disbursement 022719," and "Professional Fee Agreement_CA EW BBrice WC Fee

26   Schedule 022719.pdf" to his personal email address.  *Id*. ¶ 39 ("Together these documents

27   represent the 'recipe' book of how ExamWorks engages doctors into its network.").  On April 5,

28   2019, Baldini emailed to himself documents titled, "EW California_MQY_6Jun19.xlsx,"

"Financials by Company-Region-BusUnit – 2018 SIBTF.xlsx," "Budget Worksheet – CA 2019.xlsx," "Likely Calcs – gina.xlsx" and "California WC Fee Analysis 10_17_19v10.xlsx." *Id.* ¶¶ 33–36 (documents are types of financial tools, valuable for business budget projection). Later in the year, on October 17, 2019, Girard sent "Page Count Reports Reveals Sups and QMEs v2.xlsx" to his personal email address. *Id.* ¶ 36 (citing confidential and proprietary models used to analyze effects of expected changes in California's rules related to QMEs for Workers' Compensation). Less than two weeks later, on October 29, 2019, Girard sent files titled "SIBTF Cases – 01-2019 to 10-2019.xlsx," and "SIBTF CA Referral Tracker by Office v2 01-2019 to 10-2019.xlsx" to his personal email. Nalley Decl. ¶ 31. These files contain specific billing details, including doctor goals, average fees per specialty and a breakdown of the SIBTF referrals by month for more than 1,200 of ExamWorks' cases. *Id.* K2's analysis further revealed that on January 8, 2020, Girard sent "Sales and Operations Meeting 010820.pptx" to his personal email; this PowerPoint presentation was used at plaintiff's quarterly meeting to discuss high-level strategy and "includes lists of specific ExamWorks clients that were identified as strategic targets." *Id.* ¶ 37. Moreover, "on page 57 of the presentation, the top five offices for a certain account representative is identified including how many referrals these law firms have provided." *Id.* The next day, on January 9, 2020, Girard sent himself "2019 First Case – CA Only.xlsx." *Id.* ¶ 32.

K2's analysis of the other two Former Employees materials produced similar results indicating, for example, in December 2019, five months before she was terminated and three months before Girard left ExamWorks, Bird sent documents to Girard's personal email, including files titled "Clients. Xlsx," containing 125,756 unique client entries with detailed contact information for plaintiff's entire United States client base; she also forwarded "Doctors.xlsx," "Doctors List 073018.xlsx" and "EW WC Emails 2.13.2020.xlsx," containing detailed contact information for more than 10,000 doctors across plaintiff's entire doctor network, including names, email addresses and specialties. *Id.* ¶¶ 28, 30. On January 16, 2020, Tejada sent the list identified as "Brown & Todoroff.xlsx" to her personal email address, noting "[E]xcel sheet represents pending cases including status of cases, for this particular law firm." *Id.* ¶ 38.

Ms. Tejada takes the position that "[o]n January 16, 2020, as part of my work for ExamWorks, I visited the law firm, Brown & Todoroff.  Because his [*sic*] office was located in a small town, where I could not be sure I would have an internet connection, I emailed myself a spreadsheet of his pending cases for my meeting.  I did this to ensure that I would have the spreadsheet on my desktop for my meeting with the law firm client, and that I would not need to access the internet to pull up the spreadsheet."  Tejada Decl. ¶ 8, ECF No. 26-4.

Finally, the forensic analysis shows that only six days after he left ExamWorks, on March 19, 2020, Girard emailed Dr. Feinberg from his IPM email account, copying Tejada and telling them: "Lots to do.  This is the spreadsheet we used to blast our message yesterday."  Pl.'s Suppl. Br., ECF No. 39, at 2 (referencing attachment titled "Client 2019.xlsx").  Mot. Prelim. Inj., Ex. 1 ("Girard March 19 Email"), ECF No. 52-1, at 15 (attachment to email showing Excel spreadsheet) (sealed).[4]  There is a spreadsheet in the record labeled "Client 2019.xlsx" that plaintiff asserts is very similar to the spreadsheet defendants must have used for the March 19 "blast out."  Pl.'s Suppl. Br. at 5 (referencing Holley Decl. at 11–18).  On the eve of the court's June 3 hearing, Girard attempted to clean up the record on this point, saying, "When I sent out the March 19, 2020 email, I must have been confused when referencing the ExamWorks client list to describe a prior 'blast.'  I was certainly referring to an IPM patient letter that . . . had just been sent out only to IPM patients."  Girard Suppl. Decl. ¶ 3, ECF No. 43; *id.*, Ex. 1 (template of letter to IPM customers) at 5.

B.   Procedural Background

On May 4, 2020, plaintiff filed its complaint against defendants asserting the following claims: (1) misappropriation of trade secrets in violation of the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836; (2) misappropriation of trade secrets in violation of the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code §§ 3426, *et seq.*; (3) breach of employment agreement; and (4) breach of fiduciary duty and duty of loyalty.  *See* Compl.

---

[4] The court granted plaintiff's request to seal documents, ECF No. 51, and directed plaintiff to file a redacted version by June 16, 2020 to file on the docket.  *See* ECF No. 61.

1          A day after filing the complaint, on May 5, 2020, plaintiff moved the court based

2  on both DTSA and CUTSA claims to temporarily restrain defendants from acquiring, accessing,

3  disclosing, or using, or attempting to acquire, access, disclosure, or use any trade secrets or

4  confidential information of ExamWorks, or derivatives thereof, including, but not limited to, any

5  documents that discuss, forward, reference, or incorporate the trade secrets or confidential

6  information of ExamWorks.  *See generally* Mot. TRO, ECF No. 4.  Plaintiff also filed its motion

7  for discovery on an expedited basis, Mot. Disc., ECF No. 6, with a certificate of service on

8  defendants, ECF No. 13.  The court promptly set the matter for a videoconference hearing on

9  May 8, 2020, ECF No. 15.  *See also* May 8 Hr'g Tr., ECF No. 25; May 22 Hr'g Tr., ECF No. 38.

10  Plaintiff's counsel attended that hearing, as did Ms. Byrd who at the time was in pro per; no other

11  defendants were represented at hearing.  ECF No. 15.  The court granted plaintiff's motion for a

12  temporary restraining order, finding that plaintiff carried its burden at this early stage of the

13  litigation by raising serious questions going to the merits of the dispute and showing the balance

14  of hardship tips in its favor.  TRO, ECF No. 17, at 2.

15          On May 15, 2020, defendants appeared through counsel on the court's docket and

16  formally opposed plaintiff's motion for preliminary injunction. Opp'n, ECF No. 26.  On May 18,

17  2020, plaintiff replied.  Reply, ECF No. 27.  As allowed by the court, the parties filed

18  supplemental briefs.  ECF Nos. 39–40.  The court set the matter for a full preliminary injunction

19  hearing on May 22, 2020.  *Id.*  After that hearing, held by videoconference, in light of the

20  expedited discovery that was underway, the court found circumstances justified leaving the

21  previously entered TRO in effect for a brief period of time pending supplemental briefing based

22  on the discovery.  ECF No. 37.

23          On June 3, 2020, the court heard oral argument again and later that day granted the

24  preliminary injunction in a summary order with explanation to follow.  Prelim. Inj. Order, ECF

25  No. 45.  This is the order EXPLAINING the court's grant of the preliminary injunction.  At no

26  time, either in their briefing or during hearing, did defendants request the posting of bond; thus

27  the court has not required one.  *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*,

28  321 F.3d 878, 882 (9th Cir. 2003) (citations omitted) (no abuse of discretion in not reaching issue

7

1    of bond where defendant did not request bond or submit any evidence of damages she would

2    incur as result of injunction).

3          The court also DETERMINES, as explained below, that defendants presumptively

4    bear the costs associated with the forensic analysis plaintiff says is required to complete review of

5    electronic discovery, subject to defendants' ability to rebut the presumption in discovery motion

6    practice.  ECF 39 at 11.

7    II.      LEGAL STANDARDS

8       A.      Preliminary Injunction

9          "A preliminary injunction is an extraordinary remedy never awarded as of right[,]"

10    *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted), and should not

11    be granted unless the movant carries the burden of proving this extraordinary remedy is warranted

12    by clear and convincing evidence, *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) ("A

13    preliminary injunction . . . should not be granted unless the movant, by a clear showing, carries

14    the burden of persuasion.") (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997))).  In

15    determining whether to issue a preliminary injunction, federal courts must consider whether the

16    moving party "[1] is likely to succeed on the merits, . . . [2] is likely to suffer irreparable harm in

17    the absence of preliminary relief, . . . [3] the balance of equities tips in [the movant's] favor, and

18    . . . [4] an injunction is in the public interest."  *Winter*, 555 U.S. at 20.

19          The Ninth Circuit has "also articulated an alternate formulation of the *Winter*

20    test[.]"  *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012).  That formulation is referred to as

21    the "serious questions" or the "sliding scale" approach: "'serious questions' going to the merits

22    and a balance of hardships that tips sharply towards the plaintiff can support issuance of a

23    preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable

24    injury and that the injunction is in the public interest."  *Alliance for the Wild Rockies v. Cottrell*,

25    632 F.3d 1127, 1131–35 (9th Cir. 2011) ("[T]he 'serious questions' approach survives *Winter*

26    when applied as part of the four-element *Winter* test.").  Under the "serious questions" approach

27    to a preliminary injunction, "[t]he elements of the preliminary injunction test must be balanced,

28    so that a stronger showing of one element may offset a weaker showing of another."  *Lopez*, 680

1  F.3d at 1072.  In each case and irrespective of the approach to a preliminary injunction, a court

2  must balance the competing alleged harms while considering the effects on the parties of the

3  granting or withholding of the injunctive relief.  *Winter*, 555 U.S. at 24.  In exercising that

4  discretion, a court must also consider the public consequences of the extraordinary remedy.  *Id.*

5          B.     DTSA and UTSA

6          As noted, plaintiff's motion for injunctive relief is based on both its federal and

7  state trade secrets claims.  "California has adopted the Uniform Trade Secrets Act ("UTSA"),

8  which codifies the basic principles of common law trade secret protection."  *MAI Sys. Corp. v.*

9  *Peak Computer, Inc.*, 991 F.2d 511, 520 (9th Cir. 1993) (citing Cal. Civ. Code §§ 3426–3426.10

10  ("CUTSA")).  To establish a violation of the CUTSA, a plaintiff must show "(1) the existence of

11  a trade secret, and (2) misappropriation of the trade secret."  *AccuImage Diagnostics Corp v.*

12  *Terarecon, Inc.*, 260 F. Supp. 2d 941, 950 (N.D. Cal. 2003).

13          At the federal level, Congress has relatively recently enacted the Defend Trade

14  Secrets Act (DTSA) to "provide Federal jurisdiction for the theft of trade secrets."  *See* DTSA of

15  2016, Pub. L. No. 114-153, 130 Stat. 376 (DTSA) (codified in scattered sections of title 18 of the

16  United States Code).  Similarly to the CUTSA, the DTSA permits the "owner of a trade secret

17  that is misappropriated" to bring a civil action, 18 U.S.C. § 1836(b), and includes substantially

18  similar definitions of "trade secret" and "misappropriation" as found in California state law.  *See*

19  18 U.S.C. § 1839(3), (5).

20          The parties do not assert any material difference between the CUTSA and the

21  DTSA.  Because the elements of a trade secret misappropriation claim under the DTSA and

22  CUTSA are substantially similar, the court analyzes both claims together below.  *See Vendavo,*

23  *Inc. v. Price f(x) AG*, No. 17-CV-6930-RS, 2018 WL 1456697, at *3 (N.D. Cal. Mar. 23, 2018).

24          C.     California Employment Law Balanced Against Trade Secret Protections

25          At the same time that it provides for protection of trade secrets, California law

26  also prohibits contractual provisions "by which anyone is restrained from engaging in a lawful

27  profession, trade, or business of any kind."  Cal. Bus. & Prof. Code § 16600 ("Section 16600").

28  This California rule is intended to protect an individual's right to engage in employment and

9

1   businesses of their choosing.  *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 946 (2008)

2   (citations omitted).  "[T]here appears to be a trend among California courts of finding that

3   § 16600 represents a fundamental public policy interest in California."  *Stryker Sales Corp. v.*

4   *Zimmer Biomet, Inc.*, 231 F. Supp. 3d 606, 621 (E.D. Cal. 2017).

5            In fact, California courts have long recognized the delicate balance between

6   promoting unfettered competition by parties such as defendants here and protecting a business

7   like ExamWorks from unfair conduct.  As the California Supreme Court observed nearly seventy-

8   five years ago, "[e]quity will to the fullest extent protect the property rights of employers in their

9   trade secrets and otherwise, but public policy and natural justice require that equity should also be

10  solicitous for the right inherent in all people, not fettered by negative covenants upon their part to

11  the contrary to follow any of the common occupations of life."  *Cont'l Car-Na-Var Corp. v.*

12  *Moseley*, 24 Cal. 2d 104, 110 (1944).  In striking the appropriate balance in a trade secrets

13  misappropriation case, a court is not constrained from fashioning an appropriate remedy as long

14  as the court remains "highly cognizant of the important policies embodied" in Section 16600.

15  *Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1096 (E.D. Cal. 2012) (citing *The Ret.*

16  *Grp. v. Galante*, 176 Cal. App. 4th 1226, 1237 (2009) (clarifying the proper focus in saying "it is

17  not the *solicitation* of the former employer's customers, but is instead the *misuse of trade secret*

18  *information,* that may be enjoined") (emphasis in original)).  In other words, "[w]hile it has been

19  legally recognized that a former employee may use general knowledge, skill, and experience

20  acquired in his or her former employment in competition with a former employer, the former

21  employee may not use confidential information or trade secrets in doing so."  *Morlife, Inc. v.*

22  *Perry*, 56 Cal. App. 4th 1514, 1519 (1997).  The misuse of trade secrets can take the form of

23  improper solicitation if the solicitation is based on another's trade secrets.  *Id.* at 1521; *see also*

24  *Klamath-Orleans Lumber, Inc. v. Miller*, 87 Cal. App. 3d 458, 465 (Ct. App. 1978) ("There can

25  be no doubt that a list of preferred customers, ascertained originally by continuous solicitation

26  and investigation, and the specially arranged list of charges and bonuses developed by long

27  experience, constitutes a trade secret of value." (citation omitted)).

28

1    The court explains below its balancing of the law of trade secret protection with

2  the defendants' essential right to fairly engage in their chosen professions, if they do so lawfully.

3  III.    DISCUSSION

4    The court has found plaintiff satisfies its burden under the *Winter* test so as to

5  warrant preliminary relief.

6    A.    Likelihood of Success on the Merits

7    The court first focuses on the likelihood of success of ExamWorks' claims under

8  California and federal trade secrets law.  *Engility Corp. v. Daniels*, 16-CV-2473-WJM-MEH,

9  2016 WL 7034976, at *8 (D. Colo. Dec. 2, 2016) (analyzing only certain claims from complaint

10 in preliminary injunction analysis based on content of plaintiff's preliminary injunction request).

11    1.    Existence of Trade Secrets

12    A "trade secret" is "information, including a formula, pattern, compilation, . . . or

13 process, that: (1) Derives independent economic value, actual or potential, from not being

14 generally known to the public . . . , and (2) Is the subject of efforts that are reasonable under the

15 circumstances to maintain its secrecy."  Cal. Civ. Code § 3426.1(d).  In other words, the

16 information "is valuable because it is unknown to others" and "the owner has attempted to keep

17 [it] secret."  *DVD Copy Control Assn. v. Bunner*, 116 Cal. App. 4th 241, 251 (2004) (citation

18 omitted).

19    a)    Derives Independent Economic Value

20    ExamWorks identifies the following information as trade secrets contained in the

21 files it alleges the Former Employees copied and retained.  The court refers to these items here as

22 the "ExamWorks Trade Secret Information."

23    -   ExamWorks' "playbook" of confidential details about its
24        California Subsequent Injury Benefit Trust Fund ("SIBTF")
         business, including case specific, doctor and revenue
25        information. For example, doctor billing totals, average fees per
         specialty, and other marketing information such as referral
26        details for cases ("Client and Doctor Lists");

27    -   ExamWorks' confidential financial documents which is not
28        shared with clients or otherwise, setting forth how ExamWorks

11

engages doctors in its provider network, including information on fee splits and financials for the California region, which would allow a competitor to easily recruit doctors by offering more lucrative terms ("Recipe Book");

- ExamWorks' confidential database of 124,756 unique client entries with detailed information for its entire U.S. client base and more than 10,000 doctors active in ExamWorks' network, including detailed information on more than 53,000 cases from IMEC[5] ("IMEC Database"); and

- ExamWorks' confidential breakdown of sales and operations strategies for California, including high-level sales stratagem, top clients in various categories, top doctors, referrals by client office as well as detailed revenue information, goals and targets, which also includes referral information from new clients. ("Marketing & Business Strategy Documents").

Nalley Decl. ¶¶ 28–29, 31–34, 37–39; Compl. ¶¶ 61, 89 (recipe book pled, as well as summary of trade secrets); Nalley Decl. ¶¶ 10–19 (detailed descriptions of trade secrets).

For the purposes of this motion, on the present record, the court finds the information ExamWorks claims as trade secret qualifies as such, given that its compilations of information "derive[] independent economic value, actual or potential, from not being generally known to the public."  Cal. Civ. Code § 3426.1(d)(1); *see Pyro Spectaculars N., Inc.*, 861 F. Supp. 2d at 1089 (finding, though publicly available customer identity and contact information by itself may not be trade secret, plaintiff's "comprehensive, if not encyclopedic, compilation of customer, operator, and vendor information" was likely protectable trade secret).

ExamWorks' "Client and Doctor Lists," for example, are likely protectable trade secrets if nonpublic, as addressed below.  "Under the California [CUTSA], Cal. Civ. Code §§ 3426, *et seq.*, a customer list may constitute a protected trade secret if it includes nonpublic information that provides a 'substantial business advantage' to competitors." *Pollara v. Radiant Logistics, Inc.*, 650 F. App'x 372, 373 (9th Cir. 2016) (quoting *Morlife, Inc.*, 56 Cal. App. 4th at

---

[5] ExamWorks' information is housed in its proprietary IMECentric and InfoCentric databases.  Because IMECentric and InfoCentric programs are used in conjunction with each other, Nalley Decl. ¶ 7, for purposes of simplification, this order refers to these databases as "IMEC".

1514).  "As a general principle, the more difficult information is to obtain, and the more time and

resources expended by an employer in gathering it, the more likely a court will find such

information constitutes a trade secret."  *Morlife*, 56 Cal. App. 4th at 1522 (citation omitted).  For

the purposes of obtaining a preliminary injunction, ExamWorks has offered sufficient evidence to

show it has expended substantial time and effort identifying customers with particular needs and

characteristics in compilations that contain more than mere identities and addresses easily

identified through publicly available sources; the compilations would give a competitor a

substantial business advantage in seeking to offer services to compete with ExamWorks' fully

integrated proprietary private network, Compl. ¶ 11; Nalley Decl. ¶¶ 13, 28–29 (referencing

millions of dollars spent annually and innumerable person-hours to develop IMEC, which

contains the list identified as "Clients.xlsx" with 124,756 unique client entries and detailed

information for ExamWorks' entire United States client base, as well as the list identified as

"Doctors.xlsx" containing detailed contact information for more than 10,000 doctors across

ExamWorks' entire United States doctor network); *Morlife*, 56 Cal. App. 4th at 1521 ("[W]here

the employer has expended time and effort identifying customers with particular needs or

characteristics, courts will prohibit former employees from using this information to capture a

share of the market.").

   ExamWorks' Recipe Book, IMEC Database and Marketing & Business Strategy

Documents are also likely protectable trade secrets. These documents comprise various marketing

and outreach strategies, explaining how ExamWorks engages doctors into its network.  Compl.

¶ 61; Nalley Decl. ¶ 43.  Specifically, ExamWorks spends significant funds on internal recruiters

to persuade doctors to join ExamWorks' network.  Nalley Decl. ¶ 13.  To be competitive, it also

nurtures relationships with the applicant attorneys making up the workers' compensation bar, who

serve as a source of doctor referrals.  *See, e.g.*, Pl.'s Suppl. Br. at 4; Mot. TRO, Ex. J

(Clients.xlsx), ECF No. 28-1 (part 2), at 11–18 (NATIVE-Clients) (sealed); *id.*, ECF No. 28-3

(part 4), at 1–912 (NATIVE-Doctors) (sealed).  ExamWorks captures key strategic information in

a variety of ways, including revenue per doctor, margin or profitability per doctor and negotiated

fee per exam for that particular doctor.  Nalley Decl. ¶ 15.  At this point, IMEC contains

1    information on more than 2,000 doctors who practice in California alone.  *Id.* ¶ 13; *see Argo Grp.*

2    *US, Inc. v. Prof'l Governmental Underwriters, Inc.*, No. SACV 13-1787 AG (DFMx), 2013 WL

3    11327772, at *2 (C.D. Cal. Dec. 6, 2013) ("[I]nformation regarding profit margins, costs, and

4    market research can be protected trade secrets." (citing *Whyte v. Schlage Lock Co.*, 101 Cal. App.

5    4th 1443, 1456 (2002))).

6            For these reasons, ExamWorks has met its burden to show its compilations of

7    information, specifically the Client and Doctors List, IMEC database, and the Marketing &

8    Business Strategy Documents, have value and are not publicly available, and therefore likely

9    qualify as trade secrets.

10                        b)       Subject of Reasonable Efforts to Maintain Secrecy

11           The court also finds ExamWorks has met its burden to show at this stage the

12   ExamWorks Trade Secret Information has been "the subject of efforts that are reasonable under

13   the circumstances to maintain its secrecy."  Cal. Civ. Code § 3426.1(d)(2); *Pyro Spectaculars*,

14   861 F. Supp. 2d at 1092 (plaintiff's "security practices are not perfect," but sufficiently

15   reasonable to support preliminary injunction).  Specifically, ExamWorks requires all employees

16   to sign confidentiality agreements recognizing the proprietary nature of its "[c]ustomer names,

17   contact information, account numbers or financial information and proprietary business

18   information not otherwise available to the public related to how ExamWorks does business."

19   Bartsch Decl., ¶¶ 6–7, ECF No. 4-3.  "Employees must recertify their understanding of the

20   Employee Handbook and Code of Business Conduct and Ethics at regular intervals."  *Id.*  The

21   Employee Handbook requires employees to maintain the confidentiality of, *inter alia*,

22   ExamWorks' "property . . . including any documents or files in [the employee's] possession and

23   any company property in electronic form" and "ensure that all ExamWorks' property is returned

24   to ExamWorks."  *Id.* ¶ 11.  Here, all the Former Employees named as defendants signed

25   confidentiality agreements confirming their understanding of, and agreement to, ExamWorks'

26   confidentiality policies; in so doing they also agreed to return ExamWorks' information upon

27   their departure or termination.  *See* Compl. ¶¶ 31, 34, 39; *id.*, Ex. A (Girard), at 39; *id.*, Ex. C

28

1  (Baldini), at 49; *id.* Ex. E (Tejada), at 56; *id.*, Ex. F (Bird), at 60.[6]  The confidentiality agreements

2  were in consideration of employment with ExamWorks, and by signing them at the start of their

3  employment defendants had notice of the agreements' terms as conditions of their employment

4  and agreed to be bound by them.  *Cf. AUA Private Equity Partners, LLC v. Soto*, No. 1:17-CV-

5  8035-GHW, 2018 WL 1684339, at *5 (S.D.N.Y. Apr. 5, 2018) (acquisition by improper means

6  properly pleaded where plaintiff alleged defendant violated confidentiality agreements she signed

7  upon being hired, which created "contractual duty to abide by their terms").

8           Additionally, ExamWorks' network is password protected, *see* Compl. ¶ 27;

9  Bartsch Decl., Ex. A ("ExamWorks' Employee Handbook"), ECF No. 4-3 ("All Systems

10  passwords and encryption keys must be available and known to the Company[.]"), and access is

11  limited to employees who need particular data sets for the purposes of carrying out their

12  employment.  Bartsch Decl., Ex. A.  ExamWorks issues mobile devices to employees, who were

13  then able to determine the passwords they would use to protect ExamWorks' information.  *See*

14  Compl., Ex. E, ECF No. 1, at 46 (ExamWorks Mobile Device Policy, providing in pertinent part

15  that "ExamWorks' Mobile Device Policy applies to all uses of your device for ExamWorks'

16  business or on behalf of ExamWorks.  In addition, you must: Consent to ExamWorks' efforts to

17  manage the device and secure its data, including providing ExamWorks with any necessary

18  passwords.").  Employees are required to take security awareness training annually and, when an

19  employee leaves the company, ExamWorks automatically cuts off all access to databases and the

20  network by that employee.  *Id.*

21           ExamWorks also requires departing employees to certify that all company assets,

22  including trade secrets, have been returned, instructing these employees to "check personal

23  computers, email accounts, and thumb drives" and "asks each employee to return all

24  ExamWorks' property" before departure.  Bartsch Decl. ¶ 11.  Here, for example, after

25  ExamWorks terminated defendant Baldini on April 29, 2020, ExamWorks asked him to complete

26

27           [6] Defendants have not objected to the court's consideration of the documents attached to
the complaint.

28

its standard offboarding checklist and certification form; Baldini did, certifying he had "returned all equipment, documents, software, hardware, and any other company property (whether physical, intellectual, or other) in [his] possession." *Id*. ¶ 44; Bartsch Decl., Ex. H, ECF No. 4-2 (offboarding checklist and certification form), at 228–229.

The efforts reviewed above, supported by the record before the court, are sufficient at this stage to show ExamWorks has made reasonable efforts, at least, to maintain the secrecy of the information it claims as trade secret.

c)      Conclusion

In sum, ExamWorks has met its burden to show the ExamWorks Trade Secret Information "derives independent economic value" and is subject to "reasonable efforts" to protect secrecy as required by statute.  *See* Cal. Civ. Code § 3426.1(d).

2.      Misappropriation of Trade Secrets

The CUTSA defines misappropriation as including either the "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or the "use of a trade secret of another without express or implied consent by a person who [] [u]sed improper means to acquire knowledge of the trade secret." Cal. Civ. Code § 3426.1(b); *see* 18 U.S.C § 1839(5) (identical DTSA provision).

While "[m]ere possession of trade secrets by a departing employee" is not sufficient to establish misappropriation, *Norsat Int'l, Inc. v. B.I.P. Corp.*, No. 12CV674-WQH-NLS, 2014 WL 2453034, at *6 (S.D. Cal. May 30, 2014) (quoting *FLIR Sys., Inc. v. Parrish*, 174 Cal. App. 4th 1270, 1279 (2009)), plaintiff here has met its burden to show the Former Employees obtained the ExamWorks Trade Secret Information for their own uses purposefully, without the consent of ExamWorks, and by "improper means."  The record supports the conclusion the Former Employees took large quantities of ExamWorks Trade Secret Information over time, including critical strategic information near the time of their resignations or terminations, with significant blocks of sensitive data sent to their private email addresses, Harris Decl. ¶¶ 6–19 -- all in violation of company policy and their employment contracts.  *See* Mot. TRO, Ex. B ("ExamWorks Confidentiality and Proprietary Rights"), ECF No. 21-1, at 60

1   (agreement signed by Girard, dated May 15, 2015, providing "All e-mail associated with an

2   ExamWorks email account on the device, both outgoing and incoming, including associated e-

3   mail attachments, created on, transmitted to, received or printed from, or stored or recorded on the

4   device ('corporate e-mail content') is the property of ExamWorks.").[7]

5          While defendants protest that much of the information they took can be obtained

6   publicly, *see, e.g.*, Defs.' Suppl. Br., ECF No. 41, at 6, they do not even attempt to argue that they

7   in fact obtained the information from public sources.  Moreover, the contents of many of

8   ExamWorks' files defy defendants' characterization, including those entitled "Clients.xlsx,"

9   "Financials by Company-Region-BusUnit – 2018 SIBTF.xlsx," "Budget Worksheet – CA

10  2019.xlsx," "Likely Calcs – gina.xlsx" and "California WC Fee Analysis 10_17_19v10.xlsx."

11  *See* Nalley Decl. ¶¶ 34–39; *see also id*. ¶ 6 (documents represent ExamWorks' investment of "a

12  significant amount of money and sweat equity" over more than a decade, to "set it apart from

13  others in the industry").  Moreover, plaintiff has shown it is likely defendants' transmissions of

14  ExamWorks' data were not only deliberate, but the culmination of a lengthy planning effort

15  conducted surreptitiously in an effort to cloak their acquisition by improper means.  As plaintiff

16  argues, email correspondence between and among Former Employees suggests that, as early as

17  October 2018, they were making plans to launch "Project Palo Alto," to form a new company to

18  compete in the same market space ExamWorks occupies; they documented the launch plan with

19  multiple emails and planning documents, in fact, preparing to use plaintiff's business data.

20  Holley Decl. ¶¶ 8, 10.  They began sending themselves ExamWorks' proprietary information

21  shortly after their covert planning began.  Nalley Decl. ¶ 34.  Their transfer of ExamWorks'

22

23          [7] As relevant here, ExamWorks' Code of Business Conduct and Ethics for its employees
    provides: "All data residing on or transmitted through the Company's computing and
24  communications facilities, including email and word processing documents, is the property of the
    Company and subject to inspection, retention and review by the Company, with or without a
25  Community Member's or third party's knowledge, consent or approval, in accordance with
    applicable law.  Personal emails, voicemails, calls or other data residing on or transmitted through
26  the Company's systems are subject to monitoring.  Any misuse or suspected misuse of the
    Company's assets must be immediately reported to your supervisor or a Compliance Officer."
27  Bartsch Decl., Ex. B ("ExamWorks' Code of Bus. Conduct & Ethics"), ECF No. 4-3, at 199.

28

1    information continued until the first departures of Girard and Tejada, and even after they had

2    departed while Baldini and Byrd remained at ExamWorks.  Tejada's awareness of the line she

3    was walking and the importance of officially not crossing the line until the predetermined time is

4    telegraphed by her making a point of clarifying, before executing her new agreement for

5    employment immediately after leaving ExamWorks, that she was to perform "no newco business"

6    at first.  Mot. Prelim. Inj. Ex. 30 (Tejada Employment Agreement), ECF No. 52-1, at 133 (Tejada

7    note asking "no newco work during this time?").  One email in particular reflects an awareness of

8    the potential problems defendants' actions posed, and their ongoing efforts to obscure them:  On

9    April 23, 2020, while Baldini remained employed by ExamWorks, in response to a message titled

10   "Ground Work" he sent to George, Girard and Tejada, as well as Feinberg and Tuthill, George

11   responded "Todd. . . you should NOT be on these emails [*sic*] threads. . . and certainly not be

12   calling meetings or making to do lists. . . not while you are employed elsewhere.  Please . . . go

13   dark . . . or limit to telephone only comm.  Get me?"  Mot. Prelim. Inj., Ex. 24 ("April 23 Baldini

14   Email"), ECF No. 52-1, at 112.  Baldini acknowledged the warning later that day, "Gone Dark!!!"

15   *Id.*

16          Not long after, upon learning that plaintiff had filed this lawsuit, George wrote

17   tellingly to Girard, "you have been leaving a trail for a long time . . . and that is not good.  The

18   good news is there is no company . . . no nuco."  Mot. Prelim. Inj., Ex. 25 ("May 5 George

19   Email"), ECF No. 52-1, at 115.  But while there was no "nuco" yet, plaintiff's complaint was

20   filed during the interim period contemplated by defendants, before the unveiling of their new

21   enterprise.

22          The record further discloses that the Former Employees not only improperly

23   acquired ExamWorks' Trade Secret Information for their personal use in working to develop the

24   "Project Palo Alto" plan, but they maintained ExamWorks' information without returning it upon

25   their departure.  It was only after plaintiff filed the complaint and moved for a restraining order

26   and preliminary injunction that defendants started to take some steps to return ExamWorks' trade

27   secrets.  Baldini now admits that when he completed the offboarding checklist and certification

28   form upon leaving ExamWorks, despite his answers then, he in fact had not "returned all

                                                    18

equipment, documents, software, hardware, and any other company property (whether physical, intellectual, or other) in [his] possession."  Baldini Decl. ¶ 2, ECF No. 26-5; Bartsch Decl., Ex. H, (offboarding checklist and certification form), at 228–229.  He also admits "he used personal electronic resources against ExamWorks policies."  Baldini Decl. ¶ 2 (admitting before leaving ExamWorks in April 29, 2020, he sent various ExamWorks' documents to his personal email).  Girard and Bird have made similar admissions following ExamWorks' filing of its complaint.  Girard Decl. ¶ 2, ECF No. 26-2 (admitting before leaving in March 13, 2020, sending various ExamWorks' documents to his personal email address); Bird Decl. ¶ 2, ECF No. 26-3 (admitting on December 2, 2019, she emailed Girard two ExamWorks' spreadsheets to his personal email address).  While Ms. Bird takes the position that she only worked for Girard, doing whatever he asked her to, Bird Dec. ¶ 2, she did not promptly produce her personal email account to plaintiff as ordered by the court, *see* Pl.'s Suppl. Brief at 9, although her counsel reported at hearing that she had finally produced it shortly before.

　　　　　The record also supports the conclusion the Former Employees not only acquired but also have used ExamWorks Trade Secret Information without consent.  Three defendants aver, using identical, carefully crafted language, that each has not "used any ExamWorks documents since I left to compete with it or to take any opportunities from it," Girard Decl. ¶ 2; Baldini Decl. ¶ 2 (same); Tejada Decl. ¶ 5.  This wording does not acknowledge that acquisition is sufficient for misappropriation; moreover, at least two items in the record strongly support the conclusion defendant have in fact made unauthorized use of at least certain information, and that also is sufficient.  *See* 3 Callmann on Unfair Comp., Tr. & Mono. § 14:32 (4th ed. 2019) ("It is not necessary to show that the defendant used the trade secret in competition with the plaintiff; either improper acquisition or use of the trade secret is enough to make out a case of misappropriation.") (citing, inter alia, *San Jose Constr., Inc. v. S.B.C.C., Inc*., 155 Cal. App. 4th 1528, 1544 (2007) ("[U]nder the UTSA 'misappropriation' can occur through improper acquisition of a trade secret, not only through use." (emphasis in original))).  One is Girard's March 19 email specifically referencing "the spreadsheet we used to blast our message yesterday," attaching a document bearing the title of an ExamWorks' proprietary list.  Pl.'s Suppl.

19

1   Br. at 2.  Girard's saying now he was confused, and providing a copy of a template for the letter

2   he says was sent, does not explain away his attaching a link to the proprietary spreadsheet to his

3   message.  The second is another email Girard sent on April 28 to Tejada, saying "I am looking for

4   the short list of SIBTF doctors to recruit."  Mot. Prelim. Inj., Ex. 26, ECF No. 52-1 ("April 28

5   Girard Email"), at 118, to which Tejada responded by sending him ExamWorks' SIBTF

6   spreadsheet.  If there is some truth to defendants' saying they have not competed directly with

7   ExamWorks or taken opportunities from it, their careful parsing may simply omit the word "yet."

8          Taking into account all of this information of record, the court concludes that, at

9   this early stage, ExamWorks has shown a likelihood of success on the misappropriation element

10   of its trade secrets claims.

11          B.      Irreparable Harm

12          The court turns to whether ExamWorks has met its burden to demonstrate it will

13   suffer irreparable harm in the absence of a preliminary injunction.  *Winter*, 555 U.S. at 20.  "An

14   irreparable harm is one that cannot be redressed by a legal or equitable remedy following trial."

15   *Optinrealbig.com, LLC v. Ironport Sys., Inc.*, 323 F. Supp. 2d 1037, 1050 (N.D. Cal. 2004) (citing

16   *Public Util. Comm'n v. FERC*, 814 F.2d 560, 562 (9th Cir. 1987)).  Ordinarily, economic injury is

17   not irreparable because monetary damages are an adequate remedy.  *Rent–A–Center, Inc. v.*

18   *Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991).  However,

19   "intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as

20   irreparable harm."  *Id.*; *see also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832,

21   841 (9th Cir. 2001) (evidence of threatened loss of prospective customers or goodwill supports

22   irreparable harm finding).  Although "loss of control over business reputation and damage to

23   goodwill could constitute irreparable harm," a court's finding of such harm cannot be "grounded

24   in platitudes rather than evidence."  *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d

25   1239, 1250 (9th Cir. 2013).  A plaintiff must "demonstrate a likelihood of irreparable injury—not

26   just a possibility—in order to obtain preliminary relief," *Winter*, 555 U.S. at 21.[8]

27   _____

28          [8] Although establishing a likelihood of success in one type of intellectual property case,
    namely a trademark infringement action, may once have created a presumption of irreparable

1    The court finds ExamWorks has met its burden of showing a likelihood of

2    irreparable harm by pointing to the threatened loss of prospective customers posed by defendants'

3    actions, as well as the threat to ExamWorks' ongoing business recruitment efforts.

4    Defendants' deep familiarity with ExamWorks' proprietary information and their

5    detailed advance planning to enter the same "med-legal" market to compete with ExamWorks—

6    after a brief, orchestrated cooling-off period for the sake of optics—supports the conclusion they

7    cannot solicit the persons and companies on ExamWorks' proprietary lists without

8    misappropriating ExamWorks' trade secrets.  As noted above, those lists are not merely copies of

9    publicly available lists, but lists developed through ExamWorks' significant efforts over time.

10   *Morlife*, 56 Cal. App. 4th at 1521 ("[W]here the employer has expended time and effort

11   identifying customers with particular needs or characteristics, courts will prohibit former

12   employees from using this information to capture a share of the market."); *id*. at 1528–29; *see*

13   *also MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 515, 520 (9th Cir. 1993) (district

14   court enjoined defendants "from soliciting any [plaintiff] computer maintenance customer and

15   from maintaining any contract with any former [plaintiff] computer maintenance customer where

16   knowledge of any such customers was obtained by [defendant] during his employment with

17   [plaintiff]"; injunction upheld to extent it properly enjoined customer solicitation).  This

18

19   harm, *see Herb Reed Enterprises, LLC*, 736 F.3d at 1250–51, recent Ninth Circuit cases have
     called into question whether this presumption is consistent with the Supreme Court's decision in
20   *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 394 (2006).  *See 7-Eleven, Inc. v. Dhaliwal*, No.
     12-CV-02276-KJM-GGH, 2012 WL 5880462, at *6–7 (E.D. Cal. Nov. 21, 2012) (citing *eBay*
21   *Inc., LLC*, 547 U.S. at 394; *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d
     873, 877 (9th Cir. 2009); *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc*., 654 F.3d 989, 998 (9th
22   Cir. 2011)).  While the Ninth Circuit has yet to directly address the impact of *eBay* on courts'
     power to presume irreparable harm in trade secrets cases in particular, this court has joined those
23   district courts who decline to rely on a presumption in determining irreparable harm. *See Cutera,*
     *Inc. v. Lutronic Aesthetics, Inc.*, No. 2:20-CV-00235-KJM-DB, 2020 WL 1234551, at *7 (E.D.
24   Cal. Mar. 13, 2020); *see also V'Guara Inc. v. Dec*, 925 F. Supp. 2d 1120, 1126 (D. Nev. 2013)
     (citing *Flexible Lifeline Systems* in declining to presume irreparable harm in trade secrets case);
25   *but see Comet Techs. United States of Am. Inc. v. Beuerman*, No. 18-CV-01441-LHK, 2018 WL
     1990226, at *5 (N.D. Cal. Mar. 15, 2018) (citing pre-*Flexible Lifeline Systems* district court
26   decisions for proposition that courts in that district presume plaintiff will suffer irreparable harm
     if proprietary information is misappropriated).

27

28

1   conclusion extends to all of ExamWorks' curated lists, including the client list attached to

2   Girard's March 19 email and the SIBTF list Tejada emailed to Girard on April 28, 2020.

3          Defendants' actions also have unfairly threatened ExamWorks' ability to recruit

4   new business through the use of its proprietary information.  Here again, Girard's April 28 email

5   to Tejada provides support for this conclusion, in that Girard expressly said he was "looking for

6   the short list of SIBTF doctors to recruit."  April 28 Girard Email at 118.  Also, although Tejada

7   says she sent the "Brown & Todoroff.xlsx" list to her personal email address on January 16 to

8   make sure she had a copy in the event of a bad internet connection, plaintiffs point to the

9   highlighting of unassigned cases on that list that allows for easy identification and poaching by a

10   competitor.  Nalley Decl. ¶¶ 28–29, 31–34, 37–39.

11          Defendants would have the court accept that any threat they pose to ExamWorks is

12   now a thing of the past.  They take the position that since their resignations and terminations, the

13   only ExamWorks document they have accessed is a list identified as "Clients.xlsx," and insist it

14   contains only publicly available information.  Defs.' Suppl. Br. at 3.  But again, the list compiled

15   by ExamWorks identifies applicant attorneys comprising 124,756 unique entries with detailed

16   contact information.  Compl. ¶ 67; Mot. TRO, Ex. J (Clients.xlsx), ECF No. 28-1 (part 2), at 11–

17   18 (NATIVE-Clients) (sealed); *id.*, ECF No. 28-3 (part 4), at 1–912 (NATIVE-Doctors) (sealed).

18   Defendants further argue that even if this list is a trade secret, it does not support an injunction in

19   this case, as there is no evidence that any applicant attorneys the Former Employees may have

20   solicited have actually done business with them.  Defs.' Suppl. Br. at 3.

21          Defendants' argument does not grapple with the fact Former Employees were in

22   the process of forming their new company although not yet launched; it also does not hold up in

23   light of the totality of the record before the court reviewed above.  The "Clients.xlsx" list is not

24   the only list defendants misappropriated and used without consent.  While defendants have

25   conceded the error of certain of their ways, they have not provided full disavowals of their plan to

26   implement Project Palo Alto by launching a business to unfairly compete with ExamWorks.

27   Defendants have dawdled in turning over all of the discovery ordered by the court.  May 22 Hr'g

28   Tr., ECF No. 38, at 4:1–4 (plaintiff's counsel's unrebutted representation that after signing

1    declaration saying she turned everything over, Tejada still had hard copy documents at home); *id.*

2    at 4:4–7 (counsel also saying Tejada "has not been able to provide" plaintiff with password for

3    Dropbox account Girard instructed her to place documents in).  As noted, Ms. Bird produced her

4    email account only a few days before the court's June 3 hearing, such that plaintiff had not had an

5    opportunity to review it.  This behavior raises a red flag and at this point allows the drawing of

6    adverse inferences.  *Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 911 (9th Cir. 2008)

7    (district court has discretion to draw adverse inference when deprived of source of information).

8    Defendants also appear to have been slow to otherwise comply with the court's orders.  *Id.* at 6:1–

9    3 (counsel representing Tejada testified at deposition she was still contacting persons she worked

10   with at ExamWorks after entry of TRO).

11         The court finds ExamWorks has met its burden to show it is likely to suffer irreparable

12   harm without a preliminary injunction.

13         C.      Balance of Equities

14         The balance of equities also tips in ExamWorks' favor.  *See Winter*, 555 U.S. at 20.   An

15   injunction will make clear to the Former Employees, as appears necessary, that they cannot

16   further use any of ExamWorks Trade Secret Information and minimize the competitive harm

17   ExamWorks might otherwise suffer as a result.  An injunction tailored to the circumstances of

18   this case will merely prevent Former Employees from engaging in unlawful acts.  Here in

19   particular, the circumstances support an injunction restraining defendants from conducting

20   business with any individual or entity that did business with ExamWorks before defendants

21   stopped working there, to the extent those individuals or entities are identified in the bundle of

22   trade secret materials defendants misappropriated.  As in *Morlife*, defendants remain free to

23   engage in their professions and solicit customers whose identities, with all of the associated

24   strategic information, are not ExamWorks' trade secrets.  56 Cal. App. 4th 1514 at 1528–29.

25   While defendants complain that such an injunction is overbroad and poses great harm to them,

26   their declarations supporting this position are generalized without providing meaningful detail

27   addressing the analysis called for here.  Girard Decl. ¶ 7; Bird Decl. ¶ 5; Tejada Decl. ¶ 7; Baldini

28

1   Decl. ¶ 5.  Moreover, that they have not sought a bond as a condition of an injunction's issuing

2   suggests their harm is overstated.

3           At this stage and on this record, the well-supported likely risk of competitive harm

4   to ExamWorks from the Former Employee's misappropriation of the ExamWorks Trade Secrets

5   Information outweighs the speculative risk to the Former Employees.  The balance of equities tips

6   in ExamWorks' favor.

7           D.      Public Interest

8           "In exercising their sound discretion, courts of equity should pay particular regard to the

9   public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. at

10  24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).  As noted above, trade

11  secret cases involving former employees traditionally often invoke the two competing public

12  interests of trade secret protection and employee mobility.  *Pyro Spectaculars*, 861 F. Supp. 2d at

13  1092–93; *see also Morlife*, 56 Cal. App. 4th at 1520.

14          Here, the court has found ExamWorks has shown a likelihood of success on the

15  merits of its trade secrets claims, a likelihood of irreparable harm if an injunction is not granted

16  and that the balance of equities tips in ExamWorks' favor.  Where the requested injunction will

17  restrain only the Former Employees' unlawful use of ExamWorks' trade secrets, the public's

18  interest in these circumstances favors issuance of the injunction.  *See Pyro Spectaculars*, 861 F.

19  Supp. 2d at 1093 (public interest supported injunction "specifically focused on preventing misuse

20  of PSI's trade secrets to solicit PSI's customers" where plaintiff satisfied three other preliminary

21  injunction requirements); *Fid. Brokerage Servs. LLC v. McNamara*, No. 11 CV 1092 MMA

22  RBB, 2011 WL 2117546, at *8 (S.D. Cal. May 27, 2011) ("[An] injunction does not prohibit

23  defendants from engaging in lawful conduct to service their new and existing clients.  Rather, it

24  narrowly restricts the unlawful solicitation of plaintiff's clientele through use of plaintiff's trade

25  secret information.").

26  IV.     DISCOVERY COSTS

27          Defendants argue they cannot finance use of an expert by ExamWorks with an

28  hourly rate of $550, Opp'n at 7, and say costs of the forensic expert's review of the expedited

1    discovery should be borne entirely by ExamWorks; alternately, they say the individual defendants

2    should pay only for the collection and imaging of their devices and the removal of any

3    ExamWorks' information from the devices.  Opp'n at 24.  Under federal discovery rules, "the

4    presumption is that the responding party must bear the expense of complying with discovery

5    requests, but [] may invoke the district court's discretion under Rule 26(c) to grant orders

6    protecting him from 'undue burden or expense.'"  *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S.

7    340, 358 (1978).  In exercising this discretion, the court must decide "whether to leave the cost of

8    complying with its order where it falls, on the defendant, or place it on the party that benefits, the

9    representative plaintiff."  *Id.*  "[T]he test in this respect normally should be whether the cost is

10   substantial . . . in relation to ability to pay."  *Id.* at 361–62.

11          Defendants argue the "Individual Defendants are being financially crushed by this

12   litigation, and cannot finance use of an expert by ExamWorks."  Opp'n at 7.  Defendants'

13   declarations note their personal financial obligations.  Girard Decl. ¶ 7 (financial responsibilities

14   for assisted living costs for mother, health insurance gap, daughter's student loans, and low equity

15   in home due to COVID-19); Bird Decl. ¶ 5 (unemployed and not paying for attorney in this

16   litigation); Tejada Decl. ¶ 7 (stating she is "not paying for, nor do I have the resources to pay for,

17   attorney's fees or the cost of this litigation," without further explanation); Baldini Decl. ¶ 5 ("My

18   personal/financial wealth is basically month to month.  I support a full family with two out of

19   state college students and extensive student loans.").  The court is not unsympathetic to such

20   obligations, but defendants do not squarely address their overall ability to pay.  Recognizing early

21   on in their planning of "Project Palo Alto" the likelihood of an "EW reaction" to their plans at

22   some point, it appears Girard and Baldini each contemplated investing significant amounts

23   monthly in their new business.  Holley Decl., Ex. E, ECF 21-2, at 19-20 (identifying "Expected

24   EW reaction in each scenario" on Project Palo Alto topic outline; estimating "all in average of

25   $28K per person per mo.").  And Bird and Tejada signal now that someone else is covering any

26   litigation costs incurred on their behalf, because they are not.

27          Given that defendants have conceded improperly taking ExamWorks' trade secrets

28   and the court has found they did so intentionally, they have not overcome the presumption that as

1    the responding party they must bear the expense of discovery, including the costs of the forensic

2    expert.  This determination, however, does not preclude defendants' seeking to overcome the

3    presumption through discovery motion practice before the assigned magistrate judge.

4    V.       CONCLUSION

5            For the reasons EXPLAINED above, the court CONFIRMS its grant of

6    ExamWorks' motion for a preliminary injunction order against defendants on the terms the court

7    provided in its June 3, 2020 order, ECF No. 45:

8            1.       Defendants are ordered to continue taking all steps to preserve evidence relevant to

9    the allegations of the complaint and/or their employment with ExamWorks, including, but not

10   limited to, any email or cloud storage accounts, computers, servers, USB thumb drives, and any

11   other electronic devices that contain relevant electronic evidence.

12           2.       Defendants are further ordered, at their own expense, to continue making any

13   electronic device or account that contains relevant electronic evidence available immediately to a

14   neutral and mutually agreed-upon third-party forensic expert (the "Forensic Expert") in order to

15   create a forensically sound image of said device, or, in the alternative, turn over the actual

16   electronic device to the Forensic Expert.

17           3.       Defendants and all persons in active concert or participation with them are hereby

18   enjoined from acquiring, accessing, disclosing, or using, or attempting to acquire, access,

19   disclosure, or use any trade secrets or confidential information of ExamWorks, or derivatives

20   thereof, as described in the complaint in this action, including, but not limited to, any documents

21   that discuss, forward, reference, or incorporate the trade secrets or confidential information of

22   ExamWorks.  For purposes of this order, the legal definition of "trade secret" is all nonpublic

23   "forms and types of financial, business, scientific, technical, economic, or engineering

24   information, including patterns, plans, compilations, program devices, formulas, designs,

25   prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or

26   intangible, and whether or how stored, compiled, or memorialized physically, electronically,

27   graphically, photographically, or in writing."  *See* 18 U.S.C. § 1839(3).  For purposes of this

28   /////

1    order, "confidential information" means all other information belonging to or otherwise relating

2    to the business of ExamWorks or its affiliates which is not generally known.

3          4.      Defendants and all persons in active concert or participation with them are ordered

4    to continue returning, without delay, all ExamWorks trade secrets and confidential information in

5    their possession, custody, or control to the office of counsel for ExamWorks (Catherine Lui,

6    Orrick, Herrington & Sutcliffe LLP, 400 Capitol Mall # 3000, Sacramento, CA 95814) to the

7    extent there are not materials already turned over to the Forensic Expert.

8          5.      Defendants are ordered, at their own expense, to work with the Forensic Expert to

9    permanently and forensically remove from all of their computers, servers, and other electronic

10   devices any trade secrets or confidential information of ExamWorks, or derivatives thereof,

11   including, but not limited to, any documents that discuss, forward, reference, or incorporate the

12   trade secrets or confidential information of ExamWorks, as defined in paragraph 3 above.

13         6.      Defendants are hereby enjoined from conducting business with any individual or

14   entity that did business with ExamWorks before defendants stopped working there, to the extent

15   those individuals or entities are identified in the bundle of trade secret materials misappropriated

16   by defendants, including, without limitation, curated lists identifying ExamWorks' clients,

17   medical providers, and doctors; provided, however, that defendants are not precluded from

18   lawfully announcing their new employment as long as any announcement does not make use of

19   plaintiff's trade secrets.

20              IT IS SO ORDERED.

21   DATED:  June 11, 2020.

22

23   _____
     CHIEF UNITED STATES DISTRICT JUDGE

24

25

26

27

28